**FOR PUBLICATION**

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

_____

In Re APPLICATION OF                         )
TOMMIE H. TELFAIR,                           )        Index No. 10-2958 (GEB)
also known as
HASSAN GATLING,                              )        **O P I N I O N**
         Petitioner.
                               )

_____


**BROWN, Chief Judge:**


Ultimately, this matter comes before the Court upon Petitioner Tommie H. Teflair's ("Telfair") submission of two filings, see Docket Entries Nos. 5 and 6, which Petitioner qualified, jointly, as his motion for reconsideration ("Motion") of the Court's prior decision entered in the instant matter. For the reasons detailed below, Telfair's present motion will be granted in form.[1] However, the Court's prior disposition of Telfair's claims will not change. Additionally, also for the reasons detailed below, a limited order of preclusion will be entered with regard to all prospective pro se filings executed by Telfair in this District, in the currently pending, closed and

---

[1] The United States Court of Appeals for the Third Circuit guided that a litigant's motion for reconsideration should be deemed "granted" when the court (the decision of which the litigant is seeking a reconsideration of) addresses the merits – rather than the mere procedural propriety or lack thereof – of that motion. See Pena-Ruiz v. Solorzano, 281 Fed. App'x 110, 2008 U.S. App. LEXIS 12436, at *2-3, n.1 (3d Cir. 2008). However, the very fact of the court's review does not prevent the court performing such reconsideration analysis (of the original application, as supplanted by the points raised in the motion for reconsideration) from reaching a disposition identical – either in its rationale or in its outcome, or in both regards – to the court's decision previously reached upon examination of the original application. See id.

future matters.

A meaningful discussion of the issues at hand is not feasible without a careful examination of Petitioners' (that is, Telfair and Catrina R. Gatling's)[2] prior actions in this District. This chain of prior actions will be subdivided into two groups: (a) the criminal matter being prosecuted against Gatling; and (b) the actions initiated against or by Telfair (that group, in turn, is comprised of two distinct categories, i.e.: (1) the matters initiated in connection with Telfair's currently ongoing criminal prosecution; and (2) the civil actions initiated by Telfair seemingly in response to his – and, perhaps, Gatling's – prosecution).

## I.     TELFAIR'S PRIOR ACTIONS

### A.      Telfair's Criminal Prosecution

It appears that the relevant events began to unfold about half a decade ago when,

> [o]n . . . September 5, 2006, officers of the Newark Police Department were dispatched to a residence at 185 Parker Street, Newark, New Jersey, to investigate a report of gunfire.  Upon arriving at the scene, officers were met by two occupants of the residence who stated that they had heard gunshots fired at the backdoor of the home.  Law enforcement officers investigated the rear entrance to the home and discovered several bullet holes in the back door and empty shell casings nearby.  After entering the residence with the apparent consent of the two occupants, law enforcement officers observed bullet holes in the front of a refrigerator in the kitchen.  An officer then examined and opened the refrigerator, finding a projectile in the bottom of the refrigerator.  While searching for other projectiles and evidence of the shooting, the officer discovered in plain view clear plastic containers holding a

_____

[2]  The original submission made in this matter asserted claims on behalf of both Telfair, also known as Hassan Gatling, and Catrina R. Gatling ("Gatling"), see generally, Docket Entry No. 1, but that submission designated Telfair as the sole applicant and bore solely Telfair's signature.  See id. at 1 and 19; see also Docket Entry No. 4, at 1.  Moreover, Telfair's later submissions, including all submissions made in connection with this Motion, suggest that Gatling was an unwilling participant (and, perhaps even unaware of her "participation" in this matter).  Therefore, while – solely for the ease of discussion – the Court qualifies Gatling as the second Petitioner in this matter, the Court's determinations are made only as to the allegations raised by Telfair and as to the litigation practices employed by Telfair, not Gatling.

substance resembling cocaine base. The officers subsequently discovered an additional substance that field tested positive for the presence of heroin, as well as several small bags containing quantities of heroin. On the following day, agents from the Drug Enforcement Administration (the "DEA") interviewed the two occupants, who stated that the heroin discovered in the residence belonged to an individual named "Hassan Gatling," an apparent alias for [Telfair]. The two occupants stated that they packaged certain quantities of heroin discovered at the residence at the direction of [Telfair] for the purpose of distribution. The two occupants further stated that they had received payment, in the form of cash and goods, from Defendant for preparing and packaging the heroin for distribution. A complaint and an arrest warrant were allegedly issued for [Telfair] on or about September 8, 2006. On January 23, 2007, [Telfair] was arrested at the home of his girlfriend, [who was] Gatling. . . . During a post-arrest interview with law enforcement, [Telfair] apparently admitted that he had engaged in criminal conduct and narcotics trafficking with several individuals on numerous occasions in the State of New Jersey and elsewhere. After extensive questioning, [Telfair] requested to speak with [an] attorney [Telfair knew], Paul Bergrin. Law enforcement officers allegedly complied with [Telfair's] request and ceased questioning him. After a brief continuance following [Telfair's] arrest, a one-count criminal indictment was filed on March 29, 2007 charging [him] with conspiracy to distribute and to possess with the intent to distribute 100 grams or more of heroin . . . . A superseding indictment was filed on May 7, 2007[,] . . . charging [him] with conspiracy to distribute one kilogram or more of heroin . . . . [That] superseding indictment was dismissed without prejudice [and Telfair] was arraigned on a [new superseding] two-count indictment . . . charging conspiracy to distribute and to possess with intent to distribute 1 kilogram or more of heroin . . . and distribution and possession with intent to distribute 100 grams or more of heroin.

USA v. Telfair ("Telfair-DMC"), 08-cr-0757 (DMC), Docket Entry No. 14 (slip opinion, hereinafter

"DMC"), at 2-4.

Telfair's subsequent criminal proceedings were conducted in this District and presided over

by the Honorable Dennis M. Cavanaugh ("Judge Cavanaugh"). Telfair proved to be a prolific pro

se litigant. For instance, during the short (two-month) period from the time of his second re-

indictment to Judge Cavanaugh's entry of the DMC decision, Telfair:

made roughly ten separate pro se filings . . . contain[ing] multiple and repetitive requests. From these filings, [Judge Cavanaugh] identified ten substantive motions upon which it appear[ed] that [Telfair was] seek[ing] relief, including: a motion to dismiss the second superseding indictment; a motion to be released on bail; a motion

to suppress statements made and evidence seized; a motion for production of <u>Jencks</u> materials; a motion for production of Rule 404(b) evidence; a motion for production of exculpatory and impeachment materials; a motion requesting that the Government preserve notes of government agents; a motion for a polygraph test; and a motion for a change of venue [ – these motions were made even though] many of these exact motions and arguments were [already] considered and decided by [Judge Cavanaugh] in a hearing on April 7, 2008[,] and a related Order issued on May 20, 2008 . . . .

<u>DMC</u>, at 4-5 and n.2 (the language of footnote 2 is incorporated, in part, in the main text).

Addressing all Telfair's motions anew, Judge Cavanaugh denied the bulk of these motions, while granting – in full – Telfair's applications for production of Rule 404(b) evidence and preservation of notes of government agents, and also granting – in part – his motions for polygraph test and for production of exculpatory and impeachment materials.  <u>See id.</u> at 15.  Judge Cavanaugh's order and accompanying <u>DMC</u> opinion to that effect were entered on December 10, 2008.  <u>See</u> <u>Telfair-DMC</u>, Docket Entries 14 and 15.

While only three weeks passed since the entry of the <u>DMC</u> opinion and accompanying order, during that time Telfair flooded Judge Cavanaugh's chambers with new applications and caused Judge Cavanaugh to hold a conference with regard to then-existing state of affairs in Telfair's criminal proceedings.  <u>See</u> <u>Telfair-DMC</u>, Docket Entry No. 19.  Upon finding Telfair's new submissions frivolous, Judge Cavanaugh entered an order dated January 9, 2010, directing the Clerk to refuse acceptance of any <u>pro</u> <u>se</u> motion from Telfair until further notice.  <u>See</u> Docket Entry No. 16.  However, as the discussion below illustrates, Judge Cavanaugh's order had no apparent effect on Telfair's prolific <u>pro</u> <u>se</u> filings.

It appears that, at that juncture, Telfair was represented by a certain Mr. Kimball (a Criminal Justice Act panel attorney who, apparently, being duly appointed by Judge Cavanaugh, replaced Bergrin upon Telfair's request for termination of Bergrin's representation): the record in <u>Telfair-</u>

DMC reflects Telfair's pro se submission made with regard to Kimball, Telfair-DMC, Docket Entry No. 17; that submission was filed less than a week after Judge Cavanaugh's directive barring Telfair's pro se filings. See id. The submission made with regard to Kimball read, in its entirety, as follows:

> Dear Mr. Kimball,
> I hope that by now you have come to understand that I don't plan to quit fighting, even if that means firing you. My life, and the life of my family, is all that matters to me, not your job not the D.A. just me and my family. So I'm kindly warning you, to do what needs to be done so that all these violations of law(s) can and will be addressed, rather by way of my present appeal, or by starting to actually put up a fight in my case. Listen, I am far from stupid, I now know what my past present counsel was/is suppose to have done, and what now needs to be done. For example: the word, supersede simply means, to make void, or repeal by taking the place of. Now what is bothering me is that you have allowed this error in facts and/or errors in laws to go uncontested, as it pertains to my now newly 2-count indictment which is a serious double jeopardy violation, and is the reckless act of multiplicity in the first instance. But of cores [sic] you already know that, the attempted innocent misrepresentation is costing my legal process to endure way to much judicial abuse. So I will keep this easily to the point, pursuant to[] rule 18 U.S.C.A. 30064 3006A, you really need to get my forensic specialist, and my investigator, and get me that polygraph test and the polygraph test specialist, I want to see the documentations/credentials of all parties being requested, and for the record I know that the federal government has the money, and is obligated to provide every aspect of effective representation, even if it is not you per se. In closing, I hope we have a proper understanding counselor, I'll see you on or about the week of January 16th, 2009!
> Respectfully Submitted,
> Mr. Tommie H Telfair
> Pro-se Litigant
> Cc File:
> Tommie H Telfair
> Clerk of the Courts
> Honorable Judge Dennis M. Cavanaugh
> Murray & Kimball's Law Offices
> Clerks of the Appeals Court

Telfair-DMC, Docket Entry No. 17 ("Letter-Kimball") (original bolding, underlining and capitalization removed).

Five days later, Telfair filed a "notice an[d] request to the United States Court of Appeals for the Third Circuit" challenging Judge Cavanaugh's decision to deny some of his motions that were addressed in the <u>DMC</u> opinion.  <u>See</u> <u>Telfair-DMC</u>, Docket Entry No. 18 ("<u>Telfair-Appeal</u>").  In addition, six days later, Telfair filed a lengthy letter addressed to Judge Cavanaugh; the letter asserted that Telfair "struggle[d] in this very serious life threatening circumstance," scolded Judge Cavanaugh for seeking to bar Telfair's <u>pro</u> <u>se</u> filings, asserted "prejudicial and judicial abuse/neglect" on the part of another judge in this District, Honorable William J. Martini ("Judge Martini")[3] and requested assignment of another court-appointed counsel (in place of Kimball) to represent Telfair.  <u>See</u> <u>Telfair-DMC</u>, Docket Entry No. 20.  Seemingly aiming to re-stress his points to Judge Cavanaugh, Telfair – two weeks later – repeated the very same filing, supplementing it with another copy of his <u>Letter-Kimball</u>.  <u>See</u>  <u>Telfair-DMC</u>, Docket Entries Nos. 21 and 22.

Within three following weeks (during which Judge Cavanaugh held a conference addressing the then-pending procedural aspects of Telfair's criminal proceeding and entered an order addressing the then-pending pre-trial motions and request for discovery, <u>see</u> <u>Telfair-DMC</u>, Docket Entries Nos. 23 and 24), Telfair's counsel was replaced again: Judge Cavanaugh appointed – to the position no longer held by Kimball – Mr. Michael N. Pedicini ("Pedicini").  <u>See</u> <u>Telfair-DMC</u>, Docket Entry No. 25.

During the next half year, while Telfair's criminal proceedings moved forward, <u>see</u> <u>Telfair-DMC</u>, Docket Entries Nos. 26, 28, 31 and 32, Telfair filed:

(a)     a letter requesting – on the grounds of his "being procedurally repressed due to the contributory negligence of counsel [and the operation of what he qualified as] prejudic[ial]

---

[3]  Telfair's proceedings presided by Judge Martini are detailed <u>infra</u>.

appellate rule 31.3" – production of "documentation and proof of documentation" of all records submitted to the Court of Appeals with regard to <u>Telfair-Appeal</u>, <u>see</u> <u>Telfair-DMC</u>, Docket Entry No. 27; and

(b)      a document titled "Attorney & Client Arrangement(s)" in which Telfair notified Pedicini of Telfair's opinion that his prior defense counsel performed "constructive fraud [and] misconduct in Office, & Rules of Professional Conduct/Responsibility and the violations thereof" and demanded from Pedicini "arrangement(s)" in the form of twenty-nine items, the list of which was comprised, <u>inter alia</u>, of such irrelevant (either to the facts underlying Telfair's prosecution or to the duties of his counsel), and/or confusing utterances as: "investigator and forensic expert," "the filing of the pertinent motions," "memorandum in support of laws and erred fact," "motion to remove a.k.a. [<u>i.e.</u>, to remove the abbreviation of the 'also known as' designation]," "appellant type motions," "silver platter doctrine violations," "bill of rights violations," "spoliation," "falsus in uno," "mens rea," "stare decisis doctrine," "address DEA fraud & misconduct/fraud of the prosecutor(s) (via) office of professional conduct and responsibility in  Washington," "protection type order for the client & client's family," "address the illegitimate dates and/or info on all paperwork," etc. <u>See</u> <u>Telfair-DMC</u>, Docket Entry No. 30 (use of parenthetical and "&" sign in original, asystemic bolding, capitalization, italization and underlining removed).  The "Attorney & Client Arrangement(s)" concluded with Telfair's directive to Pedicini to seek recusal of Judge Cavanaugh on the grounds of Telfair's opinion that Judge Cavanaugh was biased against Telfair.  <u>See</u> <u>id.</u> at 2-3.

Apparently complying with the wishes of his client, Pedicini moved for recusal of Judge Cavanaugh, see Telfair-DMC, Docket Entry No. 33, clarifying that he was making that application upon Telfair's directive and explaining that Telfair's opinion about Judge Cavanaugh's "bias" was derived from Telfair's displeasure with those prosecutorial actions which Telfair qualified as "misconduct" and from Telfair's disappointment with Judge Cavanaugh's finding that the venue of Telfair's prosecution need not be changed.  See Telfair-DMC, Docket Entry No. 33-1.  Pencini's application for recusal was denied by Judge Cavanaugh, who continued presiding over Telfair's prosecution, conducted a chain of conferences and issued numerous orders propelling Telfair's criminal proceedings.  See Telfair-DMC, Docket Entries Nos. 35, 36, 44 and 45.

In response to Judge Cavanaugh's actions, Telfair generated new filings, such as:

(a)     an eleven-page single-spaced document titled "Urgent Consideration Required" aiming, apparently, to teach Judge Cavanaugh procedural and substantive law, see Telfair-DMC, Docket Entry No. 37;

(b)     a thirty-six-page document titled "Conditional Application or Alternative Petition" asserting that Judge Cavanaugh's decisions propelling Telfair's criminal action were a result of a collective plot, allegedly perpetrated by all prosecutors and all Telfair's defense attorneys, Telfair-DMC, Docket Entry No. 38;

(c)     a twenty-eight-page document virtually identical to the prior one, Telfair-DMC, Docket Entry No. 39;

(d)     a five-page "Affidavit of Merit(s)" asserting that the DEA "agents and/or prosecution did knowingly threaten [Telfair] physically, mentally, and emotionally . . . by way of using [Telfair's] children(s) mom as leverage," see Telfair-DMC, Docket Entry No. 40;

(e)     a twenty-eight-page single-space motion seeking to use Telfair's "polygraph-test examiner

         as [Telfair's] character witness," <u>see</u> <u>Telfair-DMC</u>, Docket Entry No. 46;

(f)     a two-part seventy-seven-page application seeking, again, dismissal of indictment on the

         grounds on the ineffectiveness of Telfair's counsel (presumably, Pedicini); that requests was

         accompanied by Telfair's opinion that his prosecutors were committing "prosecutorial

         misconduct, constitutional-tort and impeachable-offenses," <u>see</u> <u>Telfair-DMC</u>, Docket Entries

         Nos. 48 and 48-1;

(g)     a forty-page "motion to dismiss due to the government's vindictiveness, selectiveness, and

         bad faith prosecution, double jeopardy, equal protection violation(s)," <u>see</u> <u>Telfair-DMC</u>,

         Docket Entry No. 49; etc.

         While Telfair's flood of motions accumulated before Judge Cavanaugh, Telfair's criminal

trial began.  <u>See</u> <u>Telfair-DMC</u>, Docket Entry No. 50 (indicating that the trial began on February 15,

2010).  Thereafter, Telfair  filed  an application seeking Judge Cavanaugh's appointment of Telfair

as his own co-counsel (on the grounds that – in Telfair's opinion – Pedicini was "refus[ing] to follow

his client's instructions" by not "explosing [sic] misconduct in office, scheme to defraud, police-

corruption, conspiracy to the deprivation of rights, conflict in law & facts, illegal-cohesion," etc.).

<u>See</u> <u>Telfair-DMC</u>, Docket Entry No. 51.  That latest application was filed on February 19, 2010 (that

is, four days into Telfair's trial) and – its merits or lack thereof regardless – was moot upon receipt,

as on that date Telfair was found guilty by the jurors empaneled for his trial.  <u>See</u> <u>Telfair-DMC</u>,

Docket Entries Nos. 53 and 54; <u>see</u> <u>also</u> Docket Entry No. 56, at 2 (denying Telfair's request to "co-

counsel").

Having been found guilty, Telfair swiftly produced another flood of voluminous applications, including:

(a)     a notice of appeal;

(b)     a twenty-seven-page motion to "take judicial notice" of "improper joinder of offenses";

(c)     a two-part sixty-seven-page "amended version" of the same;

(d)     a motion to "appoint new counsel" asserting that Telfair was "procedurally deprived" by Pedicini's "intentional neglect(s) [and] contributory-negligence," and informing the court that Telfair filed a legal malpractice action against Pedicini, see Telfair-DMC, Docket Entries Nos. 57-61 (and Docket Entry No. 71, at 10, replicating the summons in the action Telfair initiated against Pedicini), etc.

These flocks of filings, in turn, prompted: (a) Judge Cavanaugh's entry of another order directing the Clerk not to accept any further pro se filings from Telfair, see Telfair-DMC, Docket Entry No. 56, which – same as the previous Judge Cavanaugh's order to that effect – was of no avail, and did not halt Telfair's exercises in pro se litigation; and (b) Pedicini's application to Judge Cavanaugh asking to relieve him from the duty of representing Telfair (in that application, Pedicini clarified that he was requesting relief in order to avoid the danger of representation while under conflict of interest). See Telfair-DMC, Docket Entry No. 72 (order granting Pedicini's request).

Finally, as Telfair began awaiting his sentencing, he submitted another (fifty-page) letter to the Court of Appeals seeking to prompt the resolution of Telfair-Appeal, see Telfair-DMC, Docket Entry No. 71; in response to which the Court of Appeals satisfied Telfair's desire for a speedy review. See Telfair-DMC, Docket Entry No. 73 (denying Telfair's appeal as interlocutory).

**B.      Telfair's Civil Actions in this District**

While the dockets in the actions comprising Telfair's criminal prosecution appear rather lengthy,[4] the cumulative of these dockets pales in comparison with Telfair's activity this Court detected in the civil actions Telfair initiated in this District.

### 1.      Proceedings Before Judge Martini

As noted <u>supra</u>, one of Telfair's submissions addressed to Judge Cavanaugh asserted "prejudicial and judicial abuse/neglect" by Judge Martini.  See <u>Telfair-DMC</u>, Docket Entry No. 20. That assertion was seemingly made in reference to Telfair's civil action <u>Telfair v. Tandy</u> ("<u>Telfair-WJM</u>"), 08-cv-0731 (WJM).

<u>Telfair-WJM</u> was initiated by Telfair's submission of a civil complaint, executed pursuant to <u>Bivens v. Six Unknown Agents of Fed. Bureau of Narcotics</u>,403 U.S. 388 (1971); that complaint (a nine-page single-spaced narrative) was received by the Clerk on February 7, 2008, <u>see Telfair-WJM</u>, Docket Entry No. 1, at 1, that is, one week after Judge Cavanaugh appointed Kimball (who replaced Bergrin) as Telfair's defense counsel.  See <u>USA v. Telfair</u>, 07-0272 (DMC) (reflecting the pertinent time line).  Assessing Telfair's <u>Bivens</u> complaint, Judge Martini observed as follows:

> Telfair, a federal prisoner currently confined at the Hudson County Correctional Center in South Kearny, New Jersey, . . . brings a civil rights complaint against the following defendants: Karen P. Tandy, Administrator of the . . . DEA; Gerard P. McAleer, Director [of the] DEA in Newark; 1-50 unknown DEA agents; 1-50 unknown federal agents; Ray McCarthy, Chief of Police [in] Newark; Murad Muhammed [an officer with the] Newark Police . . . ; 1-50 unknown police officers; Paul W. Ber[g]rin, Esq.; and Christopher Christie, United States Attorney for the District of New Jersey. . . . Telfair alleges that on January 23, 2007, he was taken into custody by DEA agents, who used terroristic threats to force [him] to admit to drug trafficking crimes or cooperate with the agents in their investigation. . . . Telfair

---

[4]  The entirety of Telfair's criminal proceedings is reflected in three distinct docket indices, namely: 06-3133, 07-0272 and 07-0757.

further alleges that he had repeatedly requested an attorney during his custodial interrogation, but his request was denied. . . . Telfair alleges that he was pressured to take the Government's plea offer, and not to make any motions with respect to the criminal charges against him. . . . Telfair claims that the defendants violated his constitutional rights under the Fourth, Fifth, Sixth, and Fourteenth Amendments. Namely, he asserts claims of false arrest, unlawful search and seizure, falsifying documents and evidence, intimidation, criminal threats, coercion, denial of his Miranda rights, denial of medical treatment, theft or conversion of personal property, denial of due process and equal protection, selective and malicious prosecution, and denial of his right to a speedy trial.

Telfair-WJM, Docket Entry No. 14, at 1-5.

Since, at the time of Judge Martini's entering his decision, the Supreme Court of the United States was yet to decide its pivotal standard-of-review case, Ashcroft v. Iqbal, 129 S. Ct. 1937 (2009), which unambiguously articulated the applicability of the standard of review set forth in an antitrust case, Bell Atl. Corp. v. Twombly, 550 U.S. 544 (2007), to civil rights claims, Judge Martini employed, out of abundance of caution, the test set forth in Conley v. Gibson, 355 U.S. 41 (1957), which was conclusively archived in Iqbal.  See Telfair-WJM, Docket Entry No. 14, at 8 (relying on Erickson v. Pardus, 551 U.S. 89 (2007), for reading of the Twombly standard as a test compatible with and substantively identical – for the purposes of civil rights challenges – to that in Conley).

So assessing Telfair's claims, Judge Martini concluded that Telfair's false arrest claims were viable based on Telfair's conclusion "that the DEA agents and other police officers had no reasonable suspicion or probable cause to arrest him."[5]  See Telfair-WJM, Docket Entry No. 14, at 14.  Therefore, Judge Martini concluded that Telfair's false arrest claim should survive sua sponte

---

[5] As the criminal complaint filed in Telfair-DMC explains, Telfair was identified – as the person orchestrating a drug trafficking scheme – by the residents of the locale where police were dispatched when gunfire was reported.  See Telfair-DMC, Docket Entry No. 1.  Upon that identification, an arrest warrant was executed as to Telfair, see id., and Telfair was arrested pursuant to that warrant, the existence of which provided probable cause for Telfair's arrest.

dismissal.  See id.  However, pursuant to the holdings of Heck v. Humphrey, 512 U.S. 477 (1994), and Wallace v. Kato, 127 S. Ct. 1091 (2007), Judge Martini also concluded that this false arrest claim should be stayed.  Then, switching to Telfair's conclusion that the DEA agents and Newark police officers conducted an unlawful search, Judge Martini ruled that this claim, too, was subject to stay under Wallace v. Kato.  See Telfair-WJM, Docket Entry No. 14, at  19.

Upon so concluding, Judge Martini turned to the remainder of Telfair's claims.  Specifically, he dismissed Telfair's claims against Bergrin (for failure to meet the color-of-law requirement), see id. at 21, as well as Telfair's claims against prosecutors (on the grounds of prosecutorial immunity), see id. at 23, and also dismissed the claim of malicious prosecution (as premature).  See id. at 24.

So finding, Judge Martini switched to Telfair's claims based on the  unelaborated allegation that "his Miranda rights were violated," see id. at 25, and dismissed these claims (on the grounds that police questioning without a Miranda warning cannot give rise to a cognizable Bivens claim).  See id. at 25-26.  Similarly dismissing Telfair's due process, speedy trial and equal protection claims, see id. at 26-27, and his property claims barred by the Federal Tort Claims Act, see id. at 29, Judge Martini directed service solely as to a single Telfair's claim that was not subject to dismissal or stay, i.e., the claim based on Telfair's unelaborated assertion that Telfair was "denied medical treatment" for his allegedly broken hand.  See id. at 27-28.

Since Judge Martini made express findings only with regard to Telfair's claims (without addressing Telfair's allegations as they applied to each particular defendant named in the caption of Telfair's civil complaint), the Clerk correctly discerned that Telfair's claims against Christie and Bergrin were dismissed.  However, since the discussion provided in Judge Martini's decision did not expressly correlate the identities of other defendants with any other Telfair claim, the Clerk – out of

abundance of caution – served process on all remaining defendants. i.e., on Ms. Tandy and Messrs. McAleer, McCarthy and Muhammad.  See Telfair-WJM, Docket Entry No. 16.

Eventually, Tandy and McAleer moved for summary judgment asserting, inter alia, that Telfair's claims had to be dismissed as based solely on Tandy and McAleer's supervisory positions. See Telfair-WJM, Docket Entry No. 30 (making the argument the correctness of which has become self-evident in light of the Supreme Court's 2009 decision, Iqbal).  Judge Martini granted Tandy and McAller summary judgment (pointing out that Telfair's pleadings – both the original complaint and the amended one – were barren of any allegations as to Tandy and McAller's personal involvement in any alleged wrong).  See Telfair-WJM, Docket Entry No. 41.

However, neither Tandy and McAleer's successful Rule 56 motions (nor the decisions that Judge Martini entered addressing Telfair's claims) renders Telfair-WJM a remarkable proceeding. Rather, the flood of submissions Telfair packed into that action renders that matter an anomaly.

Indeed, in addition to his original and amended complaints, Telfair filed, inter alia:

(a)     a ten-page single-spaced "petition in support of civil motion," to Judge Martini, see Telfair-WJM, Docket Entry No. 12;

(b)     a nineteen-page "memorandum of law in support of bail motion and due process violations," to Judge Martini but also addressing issues not raised in Telfair's original or amended pleadings, see Telfair-WJM, Docket Entry No. 13;

(c)     an appeal with regard to Judge Martini's decision (asserting that "while [Telfair] struggle[s] in the fight for [his] life," Judge Martini improperly erred in his conclusions by dismissing Telfair's claims on such a petty basis as Telfair's failure to assert sufficient grounds for Telfair's claims), see Telfair-WJM, Docket Entry No. 20;

(d)     another letter asserting that, while Telfair "struggle[s] in this very serious legal circumstance[, he is] being forced between a rock and a hard place" by Judge Martini's "sabotaging [his] case intentionally [and] allow[ing] much miscarriage of justice to be swept under the rug," see Telfair-WJM, Docket Entry No. 25;

(e)     a letter apparently related to Telfair's legal malpractice action against Bergrin,[6] putting Judge Martini on notice of Telfair's opinion that Bergrin was "intentionally stalling these proceedings with which [Bergrin] is causing serious additional injury to [Telfair's] legal process," see Telfair-WJM, Docket Entry No. 31;

(f)     a "declaration in support of plaintiff-petitioner(s) civil-action," in which he "respectfully request[ed Judge Martini to] offer [Telfair] the constitutionally fair administration of justice," see Telfair-WJM, Docket Entry No. 32;

(g)     a "declaration in support of petitioner(s)," stating effectively the same, see Telfair-WJM, Docket Entry No. 33;

(h)     one more "declaration," asserting – again – the same, see Telfair-WJM, Docket Entry No. 34;

(i)     a letter aiming to prompt the Court of Appeals to reach a speedier decision with regard to Telfair's Appeal of Judge Martini's screening of the complaint in Telfair-WJM, see Telfair-WJM, Docket Entry No. 37;

(j)     a Rule 60 motion, see Telfair-WJM, Docket Entry No. 38;

(k)     a copy of Telfair's "Attorney & Client Arrangement(s)" aimed at Pedicini, the counsel

---

[6] That action against Bergrin appears to be a distinct and different proceeding from the legal malpractice action Telfair initiated against Pedicini. This Court has no information as to whether or not Telfair initiated analogous action against his other defense counsel, i.e., Kimball.

representing Telfair in Telfair-DMC, see Telfair-WJM, Docket Entry No. 39;

(l)     a letter notifying Judge Martini that Telfair was applying for certiorari from the United States Supreme Court, see Telfair-WJM, Docket Entry No. 43;

(m)     a letter providing Judge Martini with details of Telfair's application for certiorari, see Telfair-WJM, Docket Entry No. 44;

(n)     a thirty-page correspondence comprised of a potpourri of documents created with regard to Telfair's criminal prosecution, see Telfair-WJM, Docket Entry No. 45;

(o)     a thirty-six-page three-part "conditional application or alternative petition," informing Judge Martini of Telfair's opinion that, with regard to his criminal proceedings, "the government and state officials have conspired to the malicious manifest deprivation of rights and the perpetration of a fraud tantamount to impeachable-offenses," see Telfair-WJM, Docket Entry No. 46;

(p)     an "affidavit of merit in lieu of certification in support of legal-matter(s)," reciting those questions that were asked during Telfair's polygraph test administered in connection with Telfair-DMC, see Telfair-WJM, Docket Entry No. 47;

(q)     a twenty-nine-page three-part "joinder tort complaint & motion to consolidate" asserting that Telfair's "prosecutions . . . have been initiated with unethical conduct and character, and with purpose of covering for state & government fraud and/or corruption, tantamount to wrongful arrest and the perpetration of a fraud & bad faith prosecution," see Telfair-WJM, Docket Entry No. 48;

(r)     another, this time thirty-one-page and six-part "joinder tort complaint," alleging the very same, see Telfair-WJM, Docket Entry No. 49;

(s)     a thirty-one-page letter reciting the same, once again, <u>see</u> <u>Telfair-WJM</u>, Docket Entry No. 50;

(t)     a thirty-three-page letter, still elaborating on the same, <u>see</u> <u>Telfair-WJM</u>, Docket Entry No. 51;

(u)     a thirty-six-page five-part repeat of the same, progressing to the language that asserted "government and state vexatious, frivolous and/or capricious bad faith prosecution and outrageous official misconduct," <u>see</u> <u>Telfair-WJM</u>, Docket Entry No. 52;

(v)     a sixty-one-page six-part "conditional application or alternative petition for review (amended) in conjunction with . . . affidavit of merit(s) in support of civil/tort action," which was still maintaining the same, <u>see</u> <u>Telfair-WJM</u>, Docket Entry No. 53;

(w)     another copy of the same "conditional application," <u>see</u> <u>Telfair-WJM</u>, Docket Entry No. 54;

(x)     an application for "emergent" relief seeking immediate trial in <u>Telfair-WJM</u>, that is, in the action where the responsive papers were yet to be filed by the two non-dismissed defendants, McCarthy and Muhammad, <u>see</u> <u>Telfair-WJM</u>, Docket Entry No. 55;

(y)     one more copy of the same "emergent" application, <u>see</u> <u>Telfair-WJM</u>, Docket Entry No. 56;

(z)     a "conditional application for order to show cause," requesting Judge Martini to issue an order directing the United States Attorney General, the United States Solicitor General, the undersigned and all not dismissed (and also all dismissed) defendants in <u>Telfair-WJM</u> to "show cause as to why the hereof pleadings should not issue against them in accordance with prayer of said pleadings," <u>see</u> <u>Telfair-WJM</u>, Docket Entry No. 58;

(aa)    a "corrected" version of the same, which – nonetheless – was alleging exactly the same, <u>see</u> <u>Telfair-WJM</u>, Docket Entry No. 59,

(bb)    as well as another motion for reconsideration, another "petition issuance for order to show cause," one more "petition issuance for order to show cause," petition for <u>de novo</u> review, application for leave to file another "oversized brief," a notice seeking joinder of claims, a letter seeking the same, etc.  <u>See Telfair-WJM</u>, Docket Entries Nos. 61-68.

Judge Martini, the Court of Appeals, the United Stated Supreme Court and even counsel for defendants in <u>Telfair-WJM</u> did not ignore Telfair's submissions.  Indeed, the Court of Appeals dismissed Telfair's appeal without reaching the issue of procedural propriety or the merits of his appeal: the dismissal was for failure to prosecute as a result of Telfair's refusal to pay the requisite filing fee.  <u>See Telfair-WJM</u>, Docket Entry No. 40.   The Supreme Court, too, addressed Telfair's challenges by issuing six decisions, first denying Telfair's application for a writ of mandamus, <u>see In re Telfair</u>, 130 S. Ct. 511, 2009 U.S. LEXIS 7902 (2009), then denying his request for a writ of prohibition, <u>see In re Telfair</u>, 130 S. Ct. 511, 2009 U.S. LEXIS 7924 (2009), then denying his application for certiorari, <u>see In re Telfair</u>, 130 S. Ct. 511, 2009 U.S. LEXIS 8176 (2009), after which denying his application for rehearing, <u>see In re Telfair</u>, 130 S. Ct. 1044 (2009), following that decision with another denial of request for rehearing, <u>see In re Telfair</u>, 130 S. Ct. 1045, 2009 U.S. LEXIS 8957 (2009), and concluding with the third round of denial of rehearing,  <u>see In re Telfair</u>, 130 S. Ct. 1045, 2009 U.S. LEXIS 8958 (2009,  entered on December 14).  Meanwhile, counsel for the long-dismissed <u>Telfair-WJM</u> defendants Tandy and McAller filed a letter addressed to Judge Martini, seeking the Court's assistance in stopping Telfair from referring, in each and every application Telfasir was filing in <u>Telfair-WJM</u>, to Tandy and McAleer as actual defendants.  <u>See Telfair-WJM</u>, Docket Entry No. 57.  In response, Judge Martini issued an order explaining to Telfair that Telfair's latest flood of submissions was virtually incomprehensible and, to the extent Telfair

wished to raise any claims on behalf of Gatling, these claims were improperly asserted since Telfair

lacked standing to raise challenges on Gatling's behalf.  See Telfair-WJM, Docket Entry No. 60.

Apparently taking notice of the fact that his submissions were read and responded to, Telfair

increased his litigious efforts by filing six submissions during just the month of June, i.e.:

(a)      a twenty-two page motion for reconsideration asserting that, in his claims related to Gatling,

        he should have been deemed to have standing to sue because he was conducting what he

        qualified as his own "chief litigation" of "tortuous-conduct . . . tantamount to ex post facto

        violation(s)," see Telfair-WJM, Docket Entry No. 61;

(b)      a twenty-five page "de novo conditional application for issuance of order to show cause," see

        Telfair-WJM, Docket Entry No. 61;

(c)      a forty-six page repeat of effectively the same, Telfair-WJM, Docket Entry No. 62;

(d)      another copy of the same,  see Telfair-WJM, Docket Entry No. 63;

(e)      an application "for leave to file oversize[d] de novo petition for review," see Telfair-WJM,

        Docket Entry No. 64;

(f)      a forty-one page "notice/joinder tort complaint with motion to consolidate" making the

        already familiar accusations of "vexatious-litigation, frivolous, and/or capricious bad faith

        prosecution and outrageous official misconduct," see Telfair-WJM, Docket Entry No. 66;

        and

(g)      a document virtually identical to the initial filing made in the matter currently before this

        Court.[7]  See Telfair-WJM, Docket Entry No. 65.

---

[7]  These submissions were not Telfair's last.  See  Telfair-WJM, Docket Entry No. 67 (a
forty-four page letter reiterating his "joinder" assertions), and Telfair-WJM, Docket Entry No. 68
(a seventy-five page submission asserting the same, with newly developed emphasis on the Fifth

## 2.    Telfair's Civil Actions Duplicative to <u>Telfair-WJM</u>

Telfair's civil litigation activities in this District were not limited to the volumes he filed in <u>Telfair-WJM</u>.  In addition to that action, Telfair also instituted two other proceedings, <u>Telfair v. Holder</u> ("<u>Telfair-DMC-Civil</u>"), 10-cv-0048 (DMC), and <u>Telfair v. Holder</u> ("<u>Telfair-SDW</u>"), 09-cv-2806 (SDW), by filing two other submissions which the Clerk qualified as Telfair's civil complaints.

In <u>Telfair-SDW</u>, Telfair submitted a two-part forty-two page document titled "petition for review/remedy," <u>see</u> <u>Telfair-SDW</u>, Docket Entry No. 1, while in <u>Telfair-DMC-Civil</u>, he filed a three-part thirty-six page document titled "corrected conditional application or alternative petition with affidavit of merit in support."   <u>See</u> <u>Telfair-DMC-Civil</u>, Docket Entry No. 1.   Judge Cavanaugh, presiding over <u>Telfair-DMC-Civil</u>, observed that: (a) Telfair's criminal trial concluded a week prior to Telfair's filing of the submission initiating <u>Telfair-DMC-Civil</u>; and (b) Telfair's claims in <u>Telfair-DMC-Civil</u> presented a mix of allegations mimicking those raised in <u>Telfair-WJM</u> and those that could, arguably, be entertained in a § 2255 action.  <u>See</u> <u>Telfair-DMC-Civil</u>, Docket Entry No. 2. Therefore, Judge Cavanaugh dismissed Telfair's "corrected conditional application or alternative petition" without prejudice, as a premature Section 2255 application.  <u>See</u> <u>id.</u> at 2.

Judge Cavanaugh's decision, entered on February 24, 2010, was substantively analogous to the one issued eight months prior by Honorable Susan D. Wigenton ("Judge Wigenton") with regard to <u>Telfair-SDW</u>.  <u>See</u>  <u>Telfair-SDW</u>, Docket Entry No. 2.  Specifically, Judge Wigenton observed as follows:

> [Telfair] is a party to another action, [<u>Telfair-WJM</u>], which is substantively identical to the instant matter.  Indeed, [Telfair's] amended complaint in [<u>Telfair-WJM</u>] is the very same document docketed in the instant matter as [Telfair's "petition for

---

Amendment).

review/remedy"].  Moreover, the other document submitted by [Telfair for Judge Wigenton's review] presents reiterations of the same, mixed with statements that vaguely resemble habeas challenges and laced with excessive amount of [Telfair's] generic legal statements and citations, the reason for which is not entirely clear to this Court.

. . .

[Telfair's] habeas challenges, i.e., challenges to the fact of his conviction or duration of his confinement, if any such challenges are intended, should be brought by filing [direct appeal or an appropriate] habeas petition, [as] a separate action.

. . .

 The [Bivens] aspects of the instant matter are duplicative of [Telfair-WJM], and should be dismissed as such [on the basis of the] power of a federal court to prevent duplicative litigation and to protect parties from the vexation of concurrent litigation over the same subject matter.

Id. at 1-2 (citations to legal sources and docket entries, as well as quotation marks, omitted).

Upon so finding, Judge Wigenton directed administrative termination of Telfair-SDW, see

id., and Judge Cavanaugh ordered the same result eight months later with regard to Telfair-DMC-

Civil.  See Telfair-DMC-Civil, Docket Entry No. 2.

## II.    CRIMINAL PROSECUTION OF GATLING

While the above-described criminal and civil matters initiated by and against Telfair were

unfolding, another criminal action got underway: the prosecution of Telfair's apparent girlfriend,

Gatling.  See USA v. Gatling, 07-3528, and USA v. Gatling (Gatling), 10-cr-0195 (DMC).

A criminal complaint against Gatling was filed on March 9, 2007 (that is, six months after

a criminal complaint was filed against Telfair).  See Gatling, Docket Entry No. 1.  Specifically, the

complaint filed against Gatling alleged that,

[o]n September 8, 2006, a criminal complaint and arrest warrant were issued by [a judge in this District] charging . . . Telfair with . . . conspir[acy] to distribute and possess with intent to distribute . . . cocaine base . . . .   Law enforcement agents learned that Telfair and . . . Gatling were romantically involved, and that Telfair had resided with Gatling at the residence located at 62 Winthrop Street, Newark, New Jersey ( . . . "Residence") prior to the issuance of the criminal complaint [against him. L]aw enforcement agents interviewed Gatling and asked [her] if she knew Telfair

[but] Gatling denied knowing [him], and denied that Telfair was her boyfriend.  On . . . September 15, 2006, law enforcement agents [again] interviewed Gatling [that interview was conducted] at the Essex County Jail in Newark, New Jersey, where Gatling was employed as a corrections officer.  During this interview, Gatling [admitted] that she had lied to law enforcement agents during [her prior] interview . . . , and admitted that Telfair was her boyfriend of approximately seven years. Gatling further stated that Telfair had visited her frequently at the Residence, and that she spoke with Telfair regularly by telephone. [Gatling] denied any other knowledge of Telfair's current location.  During this [second interview], law enforcement agents advised Gatling, in substance, that Telfair was a fugitive, and that if she assisted Telfair in avoiding arrest, she could he charged with harboring a fugitive.

On . . . January 22, 2007, law enforcement agents observed an individual subsequently identified as Telfair, exit the Residence and enter a Honda Pilot parked outside the Residence.  Law enforcement agents determined that this Honda Pilot [was] leased in defendant Gatling's name.  Later that same day, law enforcement agents observed the Honda Pilot arrive at the Residence driven by Gatling.
. . .
On . . . January 23, 2007, law enforcement agents arrested Telfair as he exited the Residence and approached the Honda Pilot parked outside.  At the time of his arrest, Telfair possessed a set of keys to the Honda Pilot and a set of keys to the Residence. Telfair also knew the code for an alarm installed at the Residence, and used this code to deactivate the alarm in the presence of law enforcement agents.
. . .
On . . . January 23, 2007, law enforcement agents interviewed Telfair who stated, in substance and in part, that: (a) he knew that a warrant for his arrest was outstanding; (b) he used the Honda Pilot to drive Gatling to her employment the prior day [(] on . . . January 22, 2007 [)]; (c) he had been residing with defendant Gatling at the residence for a long time; and (d) his clothing was stored in the bedroom of the Residence.
. . .
On . . . January 31, 2007, law enforcement agents interviewed Gatling who stated, in substance and in part, that: (a) she recalled being interviewed by law enforcement agents . . . concerning the whereabouts of Telfair; (b) at all times following her initial interview with law enforcement agents . . . and continuing through January 31, 2007, Gatling knew that a warrant for Telfair's arrest remained active and that Telfair remained a fugitive; (c) Telfair began periodically visiting Gatling at the Residence [since] November 2006, [and] Telfair's visits became more frequent, and . . . eventually Telfair resumed living at the Residence with Gatling and her son; (d) Telfair utilized Gatling's cellular telephone [( since] Telfair did not have a phone of his own; (e) Telfair drove Gatling's Honda Pilot and transported [her] to and from her employment at the Essex County Jail; and (f) she knew that Telfair possessed a set of keys to the Residence.

Id.

On March 13, 2007, four days after the above-quoted criminal complaint was filed, Gatling was arrested and ordered released, same day, on $50-thousand bail.  See Gatling, Docket Entries Nos. 2 and 5.   Unlike Telfair's criminal proceedings, Gatling's prosecution has been uneventful. See Gatling, Docket Entrioes Nos. 4 to 27 (indicating, inter alia, appointment of counsel for Gatling (who, as this Court writes this Opinion, seemingly continues his representation of her), waiver of preliminary hearing, relaxation of the terms of Gatling's bail bond by removing any encumbrances from the property of her bond co-signor, etc.).  This apparently mutual civility continued throughout Gatling's indictment and arraignment processes (which took place on March 18, 2010, and May 12, 2010, respectively, resulting in the entry of a formal charge on one count of harboring a felon), see Gatling, Docket Entries Nos. 28 and 31, and remained throughout discovery.[8]  See Gatling, Docket Entries Nos. 32 - 34.

On August 3, 2010, Judge Cavanaugh, presiding over the Gatling matter, held a hearing with regard to Gatling's decision to plea guilty to the harboring a felon charge, see Gatling, Docket Entry No. 35 (directing, inter alia, continuance of her bail); accord Gatling, Docket Entries Nos. 36 and 37 (Gatling's application for permission to enter plea of guilty and her plea agreement), and set Gatling's sentencing date for November 15, 2010.  See Gatling, Docket Entry No. 35.[9]

---

[8]  The discovery proceedings led to prosecutorial filing of another charge (corresponding to the information asserted in Gatling's criminal complaint), i.e., that Gatling made false statements to the DEA officials during her initial and second interviews.  See Gatling, Docket Entry No. 33.

[9]  The plea agreement indicates the prosecutor's intent to recommend, upon Gatling's compliance with her part of the agreement, "a downward adjustment of 2 levels" of the penal penalty which is applicable, under the United States Sentencing Guidelines, to the offense with regard to which Gatling elected to plea guilty.  See Gatling, Docket Entry No. 37, at 7.

### III.    SUBMISSIONS MADE IN THE INSTANT MATTER

The instant matter was initiated by Telfair by filing a submission executed on June 3, 2010, see Instant Matter, Docket Entry No. 1, at 19 (i.e., three and a half months after Telfair was found guilty and at the time when Telfair was prompting the Court of Appeals to speed up the resolution of Telfair-Appeal; it was also about three weeks after Gatling was arraigned on the harboring a felon charge, see Telfair-DMC and Gatling, Dockets).   That original submission consisted of three parts totaling twenty-eight pages.   See Instant Matter. Docket Entry No. 1.   Nine days later, that is, on June 25, 2010, the Clerk received from Telfair an "emergent de novo grievance," this time encompassing forty-two pages.   See Instant Matter, Docket Entry No. 2.   Pursuant to the dictates of Local Civil Rule 104.1(e)(2), the instant matter was reassigned to the undersigned.

### A.    Telfair's Initial and Second Filings in the Instant Matter

The Court can roughly map the content of Telfair's aforesaid first two rounds of submissions as follows:

1.    The first round consists of: (a) a one-page declaration averring that Telfair was making his statements under penalty of perjury, see Instant Matter, Docket Entry No. 1-1; (b) an eight-page "appendix" (informing this Court that, with regard to Telfair-DMC, Telfair was administered a polygraph test and, in addition, that he had filed a legal malpractice action in state courts against Pedicini), see Instant Matter, Docket Entry No. 1-2; and (c) a nineteen-page single-spaced grievance form ("Form-I").   The Form-I is a purely "homemade" production, that is, in the sense that it integrates: (a) the language obtained by Telfair from some pre-printed form (or from various pre-printed forms) and ethics code; with (b) the material generated by Telfair himself, i.e., the Form-I is merging all of the above into what

strives to appear as a single pre-printed document just "filled up" by Telfair.  See Instant

Matter, Docket Entry No. 1.  As noted at the outset of this Opinion, the first page of the

Form-I designates Telfair as the "grievant," and the last page bares solely Telfair's signature,

while – as detailed below – the body of the Form-I is seemingly focusing – and setting the

bulk of claims – on behalf of Gatling.  The content of the Form-I, while lengthy, warrants at

least a cursory overview.  Specifically,

a.      The Form-I opens with the introductory language reading, "Mail this Form to one of

the Clerk(s) of the Courts, For The United States District Court for the District of

New Jersey 3rd cr. Mark the Envelope 'Confidential: Professional Misconduct

Complaint' or 'Confidential: Judicial Disability Complaint,'" see Form-I, at 1

(capitalization and lack thereof in original), seemingly aiming to create the

impression that this District generated "a" pre-printed form that was eventually

utilized by Telfair for the purposes of submitting the Form-I, even though this

District neither created nor disseminated such a form, not could it ever refer to the

Third Circuit as "3rd cr."[10]  Upon so opening, the Form-I proceeds to the heading

which reads, "RULES OF ADMISSION AND PRACTICE (APPENDIX TO RULE

46 OF THE RULES OF PRACTICE AND PROCEDURE) RULE 6 -

---

[10]  Telfair's use of the sentence "Mark the Envelope 'Confidential: Professional
Misconduct Complaint' or 'Confidential: Judicial Disability Complaint'" suggests that he might
have borrowed some language from pre-printed/online forms disseminated by federal Courts of
Appeals.  See, e.g., http://www.cadc.uscourts.gov/internet/home.nsf/Content/VL%20-%20
Forms%20-%20Judicial%20Misconduct%20Complaint%20Form/$FILE/Judicial%20Misconduc
t%20Complaint.pdf (replicating the form disseminated by the United States Court of Appeals for
the D.C. Circuit, which opens with the line "Mark envelope 'JUDICIAL MISCONDUCT
COMPLAINT' or 'JUDICIAL DISABILITY COMPLAINT.' Do not put the name of the judge
or magistrate on the envelope") (capitalization in original).

ACCUSATION OF PROFESSIONAL MISCONDUCT"; that heading, in turn, is followed by what seems to be Telfair-generated three pages of dictates as to how this Court and the Clerk should act.  See id.[11]

b.     After stating the above-discussed three pages of Telfair's "rules" (the origin of which this Court cannot discern), the Form-I proceeds with another two pages of copied material, this time replicating Canon One of the Code of Judicial Conduct ("CJC," which is facially inapplicable to any matter of attorney – rather than judicial – discipline), then reproduces an eliminated commentary to Cannon One,[12] and then merges the language of that eliminated commentary into altered-by-Telfair parts of the Preamble to the CJC.  See Instant Matter, Docket Entry No. 1, at 3-4.

c.     Having provided such four-page "introduction," Telfair – once again – designates himself as a "grievant" and, at that juncture, introduced Gatling by designating her

---

[11]     However, "Rule 46" addressing attorney-related issues is a Federal Rule of *Appellate* Procedure, which is: (i) inapplicable to internal procedural operations of a district court; and (ii) does not contain any language even remotely resembling that employed in the Form-I.  Compare Fed. R. App. P. 46, http://www.uscourts.gov/uscourts/RulesAndPolicies/rules/AP2009.pdf., at 44-45 (setting forth Appellate Procedure Rule 46 in its entirety).   Moreover, while Rule 46 relates, at least, to the issues of attorney discipline, the rationale of Telfair's reference to "Rule 6" escapes this Court since no "Rule 6" in either the Federal Rules of Appellate Procedure or in this District's Local Rules relate, in any way or fashion, to the matters of attorney ethics. This District's extensive regulations (discussed infra) pertaining to the issues of attorney discipline are set forth in Local Rule 104.1, which is read in conjunction with its companion Local Rule 103.1. See http://www.njd.uscourts.gov/rules/completeRules2010.pdf, at 79-89.

[12]    The commentary quoted by Telfair was eliminated when the Code of Judicial Conduct of the American Bar Association, as amended by the New Jersey Supreme Court, replaced the Canons of Judicial Ethics of the American Bar Association.  See http://www.judiciary.state.nj.us/rules/appendices/app1_jud.htm.

as his "associated aggrieved."[13]   See id. at 4.  He also clarifies that he is grieving

about the conduct of "Office of the U.S. Attorneys' the Agent(s) for the Government

and Defense Counselor(s)," but makes this statement without providing a single

specific name of any attorney, hence, inviting this Court to conduct a disciplinary

review of *all* lawyers employed by the Office of the United States Attorney and, in

addition, of *all* lawyers that ever acted or are currently acting as defense counselors

(presumably, in this District).  See id.

d.      The following twelve pages of the Form-I represent a narrative, which is subdivided

into thirty-three paragraphs (with a heading reading "Colloquy" interjected into the

midst of that narrative).  See Instant Matter, Docket Entry No. 1, at 5-38.  These

thirty-three paragraphs are, in turn, composed of intermeshed statements that could

be roughly subdivided into three categories:

(i)     generalities, often nearly identical to the content of Telfair's multiple

applications filed in Telfair-DMC and Telfair-WJM; these statements are

peppered by legal and Latin terminology having no relevance to the content

of the narrative.  See id.  For instance, Telfair informs this Court that

> [t]he aggrieved, Telfair and Gatling and their children[[14]] have
> had to suffer irreparable injury, duress, and the emotional
> stress and strains as a result of Gatling being used as collateral
> through [Telfair's] entire litigation(s) in fear of, as a mother
> losing their children, their home, and as a child losing their

---

[13]  This Court is not familiar with the concept of "associated aggrieved," and the Court's
research of that term in primary and secondary sources yielded no result.

[14]  The Court notes, in passing, that the submissions made in Gatling's criminal
prosecution and the statements made by Telfair in Telfair-WJM indicate that Gatling has *one* son.

mother after already losing their father, See > Estoppel by Negligence and the violations thereof. The derivative - tort, ex post facto, and the ex delicto stems from Gatling being used as collateral and is NOW being used as a unilateral punishment for [Telfair] and/or where the government is trying to dissolve Gatling's litigation in order to escape further liability, See > Legal — Estoppel and the violations thereof. [Both] Gatling, and her family have suffered irreparable injury and will sustain further overt-action(s) unless this grievance is granted or, in the alterative given "Full" Prima Facie Review on its merits. [Telfair] ha[s] continually been deprived of rights, and the necessity for emergent intervention is of a unique-crux. The fact(s) based on the present and previous pleading submitted to the District Court by [Telfair] qualifies [Telfair] for automatic-standing to complain and the paradox situation inadvertently have created procedural - discrimination and further exposes [Telfair] and Gatling to official - retaliations of epidemic proportions . . . . [Telfair and Gatling] have been the victims of extreme machination by the governments' attorneys' and the attorney(s) whom where to defend them, and that due to the fraud by the inducement, Gatling have been force to resign from her job in law enforcement as a result of the overt - actions and professional misconduct initiated hereinafter. . . . As can be clearly seen here, the Government is attempting to coerces [Gatling] to assist in the furtherance of obstructing justice to avoid the repercussion of its overt - actions tantamount to retaliation and the scheme to defraud. . . . The prejudicial maneuvering by the official(s) have led to the impediment of the grievant(s) rights for judicial relief, additionally Gatling and her family is suffering - severely and to put it blunt, it is mandatory that the law respond either enjoining what's been happening, and issue an order of protection, and/or restraining order which would prevent further injury pending review on the merits in the interest of justice. . . . Standing - Zone of Protected Interest. . . . Gatling is a single mother working two - jobs, and due to the overt - actions of her attorney(s) acting to effect the malpractice - tort, coupled by the overt - actions of the government's official acting to effect speculation and wagering on official information, suborning perjury and the constitutional & negligent - tort, and the conspiracy to the deprivation of rights, Gatling is being faced with a federal conviction for something that she is innocent of . . . . Presently the

government or its state counterpart is trying to legitimize the overt - actions initiated through the arrest and federal prosecution of [Telfair and] Gatling tantamount to government - retaliation presently aimed at Gatling because [Telfair] ha[s] been fighting his case and for exercising his constitutional and procedural rights.  The government is also being tactical due to the "enormous amount of liability the government faces if found guilty of the allegations" tantamount to Prima Facie Tort. See > Affidavit of merits attached herewith. . . . There is no way without the proper judicial jurisprudence [Telfair and] Gatling or her children could survive the impact of these violations; there is no way Gatling is going to have the money, strength or courage to defend herself against might and machinations of the government with all the is at stake for the government, nor the resources to defend against the allegation, where the entire legal process have been leveled in total favor of prosecution. coupled by the fear of what lo[]sing could mean for a person that has never been in any trouble and is now fighting for her life, and the life of her children; base on the foregoing, [Telfair] is at the mercy of this tribunal to prevent the obvious.  Gatling nor her children should have to pay for the unethical law practices of the officials whom are trying everything to justify what's been done during this entire situation, versus trying to correct what's been done throughout this entire legality. Based on the foregoing predicates [Telfair] implores this tribunal to expedite the petition for review in the furtherance of justice. . . . [Telfair] further request that an order be entered enjoining any harassments of [him], Gatling and any witnesses of same from any government or state officials; and further implore this tribunal to lend assistance in the foregoing matter(s), because of the hardships of the circumstances, Gatling blames [Telfair] for the action taken by the arresting officials and the actions furthered by the government . . . . [T]he fact that [Telfair] ha[s] been confined for more than 3-years . . . [is] leaving [Telfair] and Gatling extremely overwhelmed physically, emotionally, and past the point of dire-straights; with no responds to [Telfair's] complaints & petition(s) for review so readily apparent, [Telfair] respectfully implore this tribunal to immediately issue an order . . . to enjoin or stay [Telfair's] and Gatling's entire [criminal] litigation . . . .

Id. at 4-16 (underlying, brackets and bolding removed; capitalization,

apostrophes, parenthetical marks, punctuation, spelling and angle brackets in original);

(ii)   The foregoing is heavily laced with Telfair's lengthy opinions as to what the applicable law and public policies are or should be.  See id. at 4-17; and

(iii)   In addition, the Form-I contains a few factual statements leading this Court to conclude that Telfair is expressing his disappointment with Gatling being relieved from her employ,  see id. at 8 ("Gatling ha[s] been forced to resign from her job in law enforcement"), with the circumstances of Telfair and Gatling's arrests, see, e.g., id. at 12, with the fact that Gatling and Telfair's criminal prosecution are currently underway rather than postponed either indefinitely or until Gatling's son is legally emancipated, see id. at 14 (referring to "Gatling's fears, her emotional state of being, and that the government is wagering on Gatling's family situation, knowing her children have no other parent left to look after them outside of [Telfair]"), with the fact that Gatling was offered a plea agreement, see id. at 13 ("government is trying to capitalize on Gatling's fears, in attempting to induce her into taking a plea or thinking she's facing 5 year and that she should accept 2 to 3 years"), with the fact that superceding indictments were filed against Telfair, see id. at 9 (referring to the "indictment number(s) which led to the double jeopardy violation"), and with the fact that his motions and applications to

call certain persons as witnesses were denied.[15]  See id.  Finally, it appears that Telfair asserts that "the government" unduly capitalized on Telfair's affections for Gatling.  See id. at 5 and 13 ("Gatling . . . used as collateral"; "Gatling . . . used by the government as collateral").

2.    Telfair's second round of submissions ("Form-II") presents effectively the same Form-I (with a few paragraphs reshuffled, and a few additional discussions of Telfair's vision of law added).  See Instant Matter, Docket Entry No. 2, at 1-20.  The part repeating the Form-I is followed by Telfair's "declaration," virtually identical to that described supra in conjunction with the Court's detailing the content of Telfair's initial round of submissions.  See id. at 22. The Form-II and declaration are accompanied by a twenty-page "appendix" which has:

(a)    a page informing this Court, once again, that Telfair is pursuing a legal malpractice claim against Pedicini in the state courts, see id. at 23;

(b)    an "affidavit of merit in lieu of certification in support of legal-matter(s)" submitted (or intended to be submitted) to an unspecified tribunal in connection with Telfair-WJM; it is discussing the polygraph test Telfair had in connection with Telfair-DMC, see 24-25; that "affidavit" is submitted jointly with a document marked "Confidential/To Whom It May Concern" and reciting the same polygraph test, see id. at 26; the two are packaged jointly with a copy of the letter from Judge Cavanaugh to Telfair's counsel addressing the issue of costs of that polygraph test, see id. at 27;

(c)    a copy of the declaration submitted by the now-dismissed defendants Tandy and

---

[15]  It seems Telfair refers to such motions as his application to Judge Cavanaugh seeking to call the person who administered Telfair's polygraph test as Telfair's character witness.

Page 31 of  84

McAleer in <u>Telfair-WJM</u>, <u>see</u> <u>id.</u> at 28-31;

(d)     a copy of the order by Judge Cavanaugh aiming to stop the flood of Telfair's filings

in <u>Telfair-DMC</u>, <u>see</u> <u>id.</u> at 32;

(e)     a copy of Gatling's proposed plea agreement,[16] <u>see</u> <u>id.</u> at 33;

(f)     copies of two letters indicating that Telfair attempted to file a grievance against

Pedicini with the New Jersey Lawyers' Fund for Client Protection, <u>see</u> <u>id.</u> at 34-35;

(g)     copies of letters indicating Telfair's filing of ethics grievances against Bergrin,

Kimball and Pedicini with the Office of Attorney Ethics ("OAE"), <u>see</u> <u>id.</u> at 36, 39;

(h)     a copy of the letter from the OAE declining docketing of Telfair's ethics grievances

against Joseph N. Minish and Paul B. Matsy, <u>see</u> <u>id.</u> at 41; and

(i)     a copy of a subpoena executed by Pedicini, in connection with Telfair's defense,

while Pedicini was representing Telfair in <u>Telfair-WJM</u>.  <u>See</u> <u>id.</u> at 37-38.

## B.     The Court's Prior Order and Telfair's Instant Motion

On August 9, this Court issued an order ("August Order") that echoed Judge Martini's prior

ruling, <u>i.e.</u>, that Telfair lacked standing to bring civil rights or habeas claims on behalf of Gatling.

<u>See</u> Instant Matter, Docket Entry No. 4; <u>accord</u> <u>Telfair-WJM</u>, Docket Entry No. 60.  In response,

Telfair submitted his instant two-part Motion seeking reconsideration of this Court's August Order.

<u>See</u> Instant Matter, Docket Entries Nos. 5 and 6.  The total volume of Telfair's Motion is two

hundred and seventy two pages, <u>see</u> <u>id.</u>, rendering this Court's detailed discussion of the content of

that submission unwarranted in light of the considerations dictated by judicial economy and the

---

[16]  The Court notes with concern the unexplained means by which Telfair obtained a copy of Gatling's proposed plea agreement.

already substantial length of this Opinion. Therefore, it shall suffice to state that Telfair, in no ambiguous terms, asserted that – in this action – he was aiming to "challenge his continued detention," <u>see</u> Instant Matter, Docket Entry No. 5, at 3, the propriety of Gatling's re-arrest, <u>see</u> <u>id.</u>, and also to raise claims of a civil rights nature[17] on the basis of the doctrine of <u>respondeat</u> <u>superior</u>. <u>See</u> <u>id.</u> at 5.   The remainder of his submission presented, essentially, a repeat of the statements already made during Telfair's first two rounds of filing executed in this matter, with addition of: (a) Fifth Amendment allegations substantively indistinguishable from those made in Telfair's recent filings executed in <u>Telfair-WJM</u>; and (b)  recitals of the claims dismissed with prejudice by Judge Martini in <u>Telfair-WJM</u>.

### C.      The Relief Sought by Telfair in This Matter

Closing its overview of the submissions made by Telfair in this matter, the Court finds it useful to quote the exact relief Telfair has been seeking in this alleged attorney discipline action. Specifically, Telfair requested:

1)      A Hearing [En Banc] in order to deter further personal and legal injury.
2)      A Injunctive, Punitive, declaratory judgment, In which to establish the predicates that the action(s) of the respondent(s) violated the Constitutional & Procedural right(s) of the grievant(s).
3)      Such other relief as this Tribunal deems just, proper, and equitable.
4)      The Grievant(s) further request appointment of [NEW] counsel and a New Judge to assist in this extreme circumstance(s).
5)      An order ENJOINING ("any") Harassment(s) or Retaliation(s) of Telfair, Gatling(s), family members, and witnesses from ("any") Official(s) acting on an individual or Official - Capacity.
6)      The aggrieved aim and purpose is to obtain relief which would [expedite] the [petition for review] pursuant to 5 U.S.C.A. § 702 — 706 (emphasis on § 702 & 705) and to [enjoin or stay] the prosecution of the aggrieved pending said review as a legally cognizable right.

_____

[17]  Indeed, Teflair recited law unambiguously indicating his intent to file a <u>Bivens</u> complaint.  <u>See</u> Instant Matter, Docket Entry No. 5, at 9.

    7)     The aggrieved motive(s) are to [primarily] seek an investigation by the superior(s) of the respondent(s) "sanctions," "declaratory," "injunctive" and "punitive," decree or, in the alternative, the aggrieved especially implores the honorable court to review the lawfulness of the previous/present legality in its entirety to determine the appropriate administration of laws in order to prevent the premeditated and/or post - meditated obstruction of Justice tantamount to the manifest [miscarriage of justice].

Instant Matter, Docket Entry No. 1, at 19 (capitalization, brackets, parenthetical and quotation marks in original).[18]

As detailed below, Telfair's Motion, same as his Form-I and Form-II, do not warrant initiation of disciplinary proceedings or any other relief.

---

[18]  Telfair's Motion sets forth an analogous request for relief, reading:

    1.     "A" declaratory, injunctive, and punitive decree.
    2.     A declaratory judgment, pursuant to 28 USCA § 2201 that the action(s) of the respondent(s) violated the Constitutional & Procedural right(s) of the Petitioner(s).
    3.     An Order enjoining, or the postponement of the underlying federal prosecution of Gatling and Telfair pending review pursuant to 5 USCA § 705 - Relief Pending Review and/or 28 USCA § 2202.
    4.     Such other relief as this court deems just, proper, and equitable.
    5.     An order ENJOINING "any" Harassment(s) of Gatling, Teflair, and witnesses from "any" Official(s) acting on an individual/Official — Capacity.
    6.     Rule 65. Injunctions and Restraining Orders  [Caution: For amendments effective December 1, 2009, see prospective amendment note to this rule.] (A) specific facts in an affidavit or a verified complaint clearly show that immediate and irreparable injury, loss, or damage will result to the movant before the adverse party can be heard in opposition; and (B) the movant's attorney certifies in writing any efforts made to give notice and the reasons why it should not be required.
Wherefore, Telfair moves this court to grant the relief herein or, in the alternative, provide reasons for the denial in the form of a conclusion of law, which will allow Petitioner to file a meaningful interlocutory appeal.

Instant Matter, Docket Entry No. 6, at 53 (capitalization, brackets, parenthetical and quotation marks in original).

**IV.     TELFAIR'S APPLICATION IS NOT A _BONA FIDE_ DISCIPLINARY GRIEVANCE**

**A.     The Bulk of Events Complained of Was Not Performed By Counsel**

A disciplinary proceeding may be conducted by this Court only under the powers articulated in the preamble of Local Civil Rule 104.1, which provides, in relevant part, that "[t]he Court, in furtherance of its inherent power and responsibility to supervise the _conduct of attorneys who are admitted to practice before it_ or admitted for the purpose of a particular proceeding . . . ." L. Civ. R. 104.1 (emphasis supplied).  Therefore, any grievance about ethics (or lack thereof) of a person who is _not_ an attorney admitted to practice in this District automatically falls outside this Court's jurisdiction.  See id.  Consequently, the bulk of facts alleged by Telfair cannot operate as a basis for any disciplinary proceeding in this District, i.e., neither the circumstances of Telfair and Gatling's arrests by the DEA agents and police officers, nor the actions undertaken (or statements made) by jail officials where Gatling was employed (or by police academy officials where Gatling was, seemingly, enrolled), that might have played part in Gatling's decision to leave her employ or law enforcement training, could fall within the scope of this Court's disciplinary review: this is so simply because these DEA agents, police officers, jail officials, etc. were not attorneys admitted to practice in this District.

Moreover, this Court – holding a mandate equal to – and in no way exceeding – those held by Judges Cavanaugh, Martini or Wigenton, has no authority to conduct any review of their decisions.  Hence, any of Telfair's allegations associated with activities of persons other than the prosecutors of Telfair and Gatling's criminal matters and their defense counsel are of no relevance to the inquiry at hand.

**B.      Telfair's Allegations Are a Mix of Civil Rights and Habeas Challenges**

While Telfair packaged his allegations into the Form-I and Form-II, each of which mimics a disciplinary grievance, and laced his challenges with excerpts from the CJC and preprinted disciplinary forms disseminated by appellate courts, these cosmetic alterations did not transform his submissions into a <u>bona</u> <u>fide</u> disciplinary grievance: "[i]t is the [content of the pleading] which defines the nature of an action."  <u>Florida Dep't of State v. Treasure Salvors, Inc.</u>, 458 U.S. 670, 706 (1982).

Here, Telfair's lists of remedies requested in the Form-I and in his Motion (seeking to halt his and Gatling's criminal proceedings, and damages from supervisory officials for alleged constitutional violations), read jointly with his statements that, ultimately, he is seeking release from confinement, unambiguously indicate that Telfair has *not* submitted a true disciplinary grievance, since he is not interested in the range of remedies a disciplinary proceeding could offer, <u>e.g.</u>, censure of certain attorneys or a suspension of their privilege to appear before this District Court in capacity of counsel, etc.[19]  Consequently, the instant matter cannot be qualified as disciplinary proceedings; rather, it is a disguised attempt to relitigate, before this Court, the matters that were adjudicated by other Judges in the District.

In other words, to the extent Telfair wishes to challenge his criminal conviction or his

---

[19]  <u>Accord</u> 28 C.F.R. 77.5 (expressly stressing that the disciplinary provisions and rules of ethics do not give rise to private remedies and "are intended solely for the guidance of attorneys for the government.  They are not intended to, do not, and may not be relied upon to create a right or benefit, substantive or procedural, enforceable at law by a party to litigation with the United States, including criminal defendants, targets or subjects of criminal investigations, witnesses in criminal or civil cases"); <u>Fleming v. Lappen</u>, 2006 U.S. Dist. LEXIS 15830 (D.N.J. Mar. 10, 2006) (relying on 28 C.F.R. 77.5 to deny a criminal defendant private remedies); <u>cf.</u> <u>In re Grand Jury Subpoena</u>, 533 F. Supp. 2d 602, 608 (W.D.N.C. 2007) ("a federal [ethics] statute . . . should not be construed in any way to alter federal substantive, procedural, or evidentiary law").

upcoming penal sentence, these challenges can be raised only by means of direct appeal or by filing a habeas application, pursuant to 28 U.S.C. § 2255. Judge Cavanaugh already explained this very point to Telfair in Telfair-DMC-Civil. See Telfair-DMC-Civil, Docket Entry No. 2 (construing Telfair's statements as a prematurely filed § 2255 habeas petition).

Analogously, Telfair's civil challenges cannot be raised in this action. Telfair's challenges based on the theory of respondeat superior were already dismissed by Judge Martini in his decision addressing Tandy and McAleer's motion for summary judgment. See Telfair-WJM, Docket Entry No. 41. It has become undisputable that the same dismissal would be warranted, under the holding of Iqbal, with regard to any official implicated solely on the grounds of his/her supervisory position. Moreover, Telfair's claims against his defense counsel were already conclusively dismissed by Judge Martini upon his initial screening of Telfair's complaint, see Telfair-WJM, Docket Entry No. 14, and cannot be relitigated in this or any other matter. See Telfair-SDW, Docket Entry No. 2 (explaining to Telfair that he cannot maintain duplicative legal actions). Finally, the same applies to Telfair's claim asserting malicious prosecution: this cause of action was stayed by Judge Martini, subject to Telfair's attaining the outcome meeting the requirements posed by the elements of this tort,[20] see id., and cannot be re-raised by initiation of an effectively duplicative proceeding. See Telfair-SDW, Docket Entry No. 2.[21]

---

[20] The same applies to Telfair's false arrest claim, see Telfair-WJM, Docket Entry No. 14; however, that claim has no relevance to any attorney action and, thus, raises no issue of attorney ethics.

[21] Telfair's disregard for the value of a judicial decision is particularly appalling in light of the fact that – with regard to Telfair-WJM – a dismissal was entered by the Court of Appeals and then the Supreme Court of the United States had to deny Telfair's six virtually identical applications.

### C.     Telfair Has No Standing to Assert Wrongs Committed Against Gatling

As noted above, the bulk of Telfair's claims assert facts related to Gatling, not Telfair. However, under the "next friend" doctrine, standing is allowed to a third person only if this third person could file and pursue a claim in court on behalf of someone who is unable to do so on his/her own.  The doctrine dates back to the English Habeas Corpus Act of 1679 and provides a narrow exception to the "case or controversy" requirement set forth in the Article III of Constitution.  See Whitmore v. Arkansas, 495 U.S. 149, 154-55 (1990).

The Whitmore Court set out two requirements that should be met by the one seeking to qualify for "next friend" standing: (a) "the 'next friend' must be truly dedicated to the best interests of the person on whose behalf [(s)he] seeks to litigate" (and it has been further suggested that a "'next friend' must have some significant relationship with the real party in interest"); and (b) "the 'next friend' must provide an adequate explanation – such as inaccessibility, mental incompetence, or other disability – why the real party in interest cannot appear on his[/her] own behalf to prosecute the action."  Id. at 163-64.  The burden is on the "next friend" to justify his/her status and, thereby, to obtain the jurisdiction of the federal courts.  See id. at 164.

In view of these requirements, this Court cannot recognize Telfair as Gatling's "next friend." Even if this Court were to hypothesize that Telfair and Gatling's relationship somehow renders Telfair "truly dedicated to the best interests" of Gatling (which, the Court notes in passing, is highly questionable granted that Telfair sought abode at Gatling's residence knowing that he was subject to arrest warrant, and Gatling was informed of the same by the DEA agents, i.e., realizing that Gatling's decision to give him shelter would expose her to criminal liability), the Court would not be able to recognize Telfair as Gatling's "next friend" simply because the second prong of Whitmore

cannot be met in the case at bar since: (a) Gatling's currently ongoing criminal proceedings unambiguously indicate Gatling's full mental capacity; and (b) Telfair's assertions that Gatling experiences "fears" of criminal prosecution and potential imprisonment simply do not render Gatling legally incompetent.

### D.        Reconsideration of Conclusions Reached in the August Order Is Unwarranted

Currently, Telfair seeks reconsideration of this Court's August Order.  However, a motion for reconsideration is a device of limited utility.  There are only four grounds upon which a motion for reconsideration might be granted: (a) to correct manifest errors of law or fact upon which the judgment was based; (b) to present newly-discovered or previously unavailable evidence; (c) to prevent manifest injustice; and (d) to accord the decision to an intervening change in prevailing law. See 11 Charles A. Wright, Arthur R. Miller & Mary Kay Kane, Federal Practice and Procedure § 2810.1 (2d ed. 1995); see also Harsco Corp. v. Zlotnicki, 779 F.2d 906, 909 (3d Cir. 1985), cert. denied, 476 U.S. 1171 (1986) (purpose of motion for reconsideration is to correct manifest errors of law or fact or to present newly discovered evidence).  "To support reargument, a moving party must show that dispositive factual matters or controlling decisions of law were overlooked by the court in reaching its prior decision."  Assisted Living Associates of Moorestown, L.L.C., v. Moorestown Tp., 996 F. Supp. 409, 442 (D.N.J. 1998).

In contrast, mere disagreement with the district court's decision is an inappropriate ground for a motion for reconsideration: such disagreement should be raised through the appellate process. See id. (citing Bermingham v. Sony Corp. of America, Inc., 820 F. Supp. 834, 859 n.8 (D.N.J. 1992), aff'd, 37 F.3d 1485 (3d Cir. 1994); G-69 v. Degnan, 748 F. Supp. 274, 275 (D.N.J. 1990)); see also Drysdale v. Woerth, 153 F. Supp. 2d 678, 682 (E.D. Pa. 2001) (a motion for

reconsideration may not be used as a means to reargue unsuccessful theories).  Consequently, "[t]he Court will only entertain such a motion where the overlooked matters, if considered by the Court, might reasonably have resulted in a different conclusion."  Assisted Living, 996 F. Supp. at 442; see also Continental Cas. Co. v. Diversified Indus., Inc., 884 F. Supp. 937, 943 (E.D. Pa. 1995) ( "[M]otions for reconsideration should be granted sparingly"); Edward H. Bohlin, Co. v. Banning Co., Inc., 6 F.3d 350, 355 (5th Cir. 1993) (a district court "has considerable discretion in deciding whether to reopen a case under Rule 59(e)").

Here, two hundred seventy two pages of Telfair's Motion do not state a single viable ground for reconsideration of the conclusion reached in the Court's August Order.  Indeed, Telfair's voluminous Motion neither informs the Court of a manifest errors of law the Court committed nor enlightens the Court about any intervening change in prevailing law.  Similarly, no statement made in the Motion indicates that the Court erred in detecting the facts upon which the August Order was based, same as no statement informs the Court of a newly-discovered or previously unavailable evidence capable of changing the outcome of the Court's analysis underlying in the August Order. Finally, while Telfair's Motion – as was the case in his first two rounds of filings in this matter (and the massive body of filings he made  in Telfair-WJM and Telfair-DMC) – asserts that the fact and circumstances of his or Gatling's prosecution amount to "manifest injustice," Telfair's statements to that effect are nothing but rhetoric insufficient to warrant reconsideration within the meaning of the standard set forth in case law elaborating on Rule 59(e).

In the context of a motion to reconsider, the term "manifest injustice" "[g]enerally . . . means that the Court overlooked some dispositive factual or legal matter that was presented to it," In re Rose, 2007 U.S. Dist. LEXIS 64622, at *3 (D.N.J. Aug. 30, 2007), making the definition an overlap

with the prime basis for reconsideration articulated in <u>Harsco</u>, that is, the need "to correct manifest

errors of law or fact upon which the judgment was based."   Alternatively, the term "manifest

injustice" could be defined as "'an error in the trial court that is direct, obvious, and observable.'"

<u>Tenn. Prot. & Advocacy, Inc. v. Wells</u>, 371 F.3d 342, 348 (6th Cir. 2004) (quoting Black's Law

Dictionary 974 (7th ed. 1999)).   "[M]ost cases [therefore,] use the term 'manifest injustice' to

describe the result of a plain error."   <u>Douglass v. United Services Auto. Ass'n</u>, 79 F.3d 1415, 1425

(5th Cir. 1996).

      The fact that the litigant complains about his – and, moreover, someone else's – ongoing

criminal prosecution (e.g., on the grounds of the litigant's belief that such prosecution is wrongful),

does not inject the danger of "manifest injustice" into the decision of the court performing collateral

review.  This very issue has recently been addressed by the Court of Appeals in <u>Duran v. Thomas</u>,

2010 U.S. App. LEXIS 18069 (3d Cir. N.J. Aug. 27, 2010).

      In his civil action initiated in this District, Duran – an inmate whose criminal proceedings

were underway – sought, just as Telfair here, release from confinement and immediate review of

his ongoing criminal prosecution; his application was based on his self-serving assertion that his

"criminal proceedings [were] 'undertaken in bad faith' and that his prosecutors [were] 'harassing'

him."  <u>Duran v. Thomas</u>, 2010 U.S. Dist. LEXIS 85014, at *12  (D.N.J. Aug. 18, 2010).   The

District Judge in <u>Duran</u> denied Duran's application for collateral review and – upon Duran's filing

of a voluminous motion for reconsideration (making arguments substantively indistinguishable

from those raised by Telfair in the Motion at bar) – denied Duran's request for reconsideration in

the sense of re-dismissing Duran's pleadings.  <u>See id.</u> at *19.  Duran appeal.  <u>See Duran</u>, 2010 U.S.

App. LEXIS 18069.  Addressing Duran's appellate application, the Court of Appeal observed that

"there [was] nothing in the nature of Duran's [accusations asserting] warrantless arrest for a controlled substances violation [and in his claims that his prosecution was malicious] to qualify [Duran's application for immediate] relief. " <u>Duran</u>, 2010 U.S. App. LEXIS 18069, at *5.

In light of the foregoing, this Court, being presented with no valid ground to reconsider the conclusion reached in the August Order, will once again dismiss Telfair's submissions, while stressing that the actual nature of these submissions has nothing in common with a <u>bona</u> <u>fide</u> disciplinary grievance.  Consequently:

(a)     Telfair's habeas challenges, to the degree such challenges were intended, if at all, will be dismissed as either a premature § 2255 application (which, upon ripening, should be brought before Judge Cavanaugh), or as an appellate application challenging Telfair's conviction, over which this Court has no jurisdiction;

(b)     Telfair's civil rights challenges, to the degree such challenges were intended, if at all, will be dismissed as duplicative of those already dismissed, stayed or pending before Judge Martini in <u>Telfair-WJM</u>; and

(c)     Telfair's habeas or civil rights challenges asserting the wrongs allegedly suffered by Gatling, to the degree such challenges were intended, if at all, will be dismissed for lack of standing.

## V.     TELFAIR'S ALLEGATIONS DO NOT WARRANT ANOTHER OPPORTUNITY TO SUBMIT A DISCIPLINARY GRIEVANCE

In light of the fact that Telfair submitted a disciplinary grievance, <u>i.e.</u>, an application invoking this Court's inherent powers and responsibilities, <u>see</u> L. Civ. R. 140.1 (preamble), the Court's analysis would be incomplete without a determination of whether the Court will grant Telfair an opportunity to cure the deficiencies of his recent submissions  in this matter by filing a <u>bona</u> <u>fide</u> disciplinary grievance alerting this Court to unethical conduct of a member of the bar

admitted to practice in this District.  See Iowa Supreme Court Atty. Disciplinary Bd. v. McGrath,

713 N.W.2d 682, 693 (Iowa 2006) (discussing the propriety of leave to amend a disciplinary

grievance).

     As the discussion below illustrates, a grant of such opportunity appears unwarranted since

those scarce facts (that are scattered among Telfair's voluminous rhetorical statements)

unambiguously indicate that no initiation of a disciplinary investigation is warranted.

### A.     The Relevant Local Rules

     Local Civil Rule 103.1 provides, in relevant part, that "[t]he Rules of Professional Conduct

of the American Bar Association[,] as revised by the New Jersey Supreme Court[,] shall govern the

conduct of the members of the bar admitted to practice [in this District], subject to . . .

modifications [ensuing from] federal statute[s], regulation[s], court rule[s] or [applicable case

law]."  L. Civ. R. 103.1(a).   Its companion provision, Local Civil Rule 104.1, governs the matters

of attorney discipline, see L. Civ. R. 104.1, covering a multitude of topics, out of which two appear

relevant, that is, "Standards for Professional Conduct," see L. Civ. R. 104.1(d), and "Disciplinary

Proceedings."  See L. Civ. R. 104.1(e).

     The latter expressly establishes this Court's jurisdiction to exercise disciplinary supervision

of "[e]very attorney authorized to practice law or appearing before this Court," L. Civ. R. 104(e)(1),

and clarifies, in relevant part, that,

> [w]hen . . . allegations of misconduct [by an attorney . . . come to the attention . .
> . of this Court, . . . the Chief Judge . . . may refer the matter to the appropriate State
> disciplinary body or, if the Chief Judge concludes that further investigation is
> warranted, . . . direct the Clerk to refer the matter [for investigation] to an attorney
> . . . admitted to practice before this Court . . . in order to determine whether a formal
> order to show cause should issue.

L. Civ. R. 104.1(e)(2).

### B.      New Jersey System of Attorney Discipline

Since Local Civil Rule 104.1(e)(2) establishes this Court's authority to "refer the matter to the appropriate State disciplinary body," id., a brief discussion of New Jersey disciplinary system appears warranted.

At the state level, attorney discipline is administered by the Office of Attorney Ethics ("OAE"), which is "the investigative and prosecutorial arm of the Supreme Court of New Jersey [that] manages 18 district ethics committees and . . . handles serious, emergent and complex disciplinary prosecutions." See http://www.judiciary.state.nj.us/oae/index.htm. The home webpage of the OAE also clarifies that: (a) "[t]he attorney disciplinary process is usually begun by the filing of an Attorney Grievance form with the Secretary of one of the Supreme Court's 18 district ethics committees;"[22] and (b) "discipline can range from an admonition, the least serious discipline, to a reprimand, censure, suspension from practice, or permanent disbarment from practice." See id, see also http://www.judiciary.state.nj.us/oae/atty_disc/atty_disc.htm (explaining that attorneys "who violate the[] standards for professional conduct are [only subject to such measures as] discipline, ranging from admonition to disbarment").  The OAE's website also states that:

> [a]ll lawyers [practicing in the State of New Jersey] obligate themselves to . . . abide by the Rules of Professional Conduct adopted by the Supreme Court of New Jersey. Those who violate *these standards* . . . are subject to discipline . . . . Because disciplining a lawyer is a serious matter, it takes . . . proof of unethical conduct [] to justify disciplinary action. [Thus, a] disagreement about how a case should be

---

[22]   The AOE's latest annual report explains that "[t]he attorney disciplinary process . . . begins with the filing of a grievance against an attorney . . . [u]pon receipt of [which], a determination is made as to whether the facts alleged, if proven [under the clear and convincing evidence standard], would constitute unethical conduct.  If the facts alleged in the grievance would not constitute unethical conduct . . . , the case will not be docketed."  See http://www.judiciary.state.nj.us/oae/2009annualreport.pdf, ¶¶ II(A) and II(B)(1).

handled – or should have been handled – does not constitute unethical conduct, even if the outcome of the case is disappointing [for the lawyer's client]. A mistake does not necessarily constitute unethical conduct either[:] . . . a simple mistake or error in judgment by itself is not unethical conduct. [Indeed, t]here [might be] situations that a client may find most annoying . . . that [would] not constitute unethical conduct. An example would be the lawyer's failure to consult with the client prior to writing every letter or prior to filing every document in the client's case, or . . . lawyer's failure to respond to all of the client's telephone calls inquiring about the progress of the case. . . . [Moreover,] the disciplinary process cannot correct a lawyer's personality problems. [Therefore, a]llegations that a lawyer was rude, used bad language [or akin] cannot . . . be investigated by the disciplinary system.

http://www.judiciary.state.nj.us/oae/atty_disc/atty_disc.htm (emphasis supplied).

### C.    Telfair's Claims Merit No OAE Referral or Investigation in this District

As noted <u>supra</u>, Telfair's Form-I (same as his Form-II) informs this Court that Telfair grieves about the conduct of the entire "Office of the U.S. Attorneys' the Agent(s) for the Government" and also about the conduct of all "Defense Counselor(s)" who, presumably, are admitted to practice in this District. <u>See</u> Instant Matter, Docket Entry No. 1, at 4. However, introducing logic into Telfair's designation of responding parties, this Court construes Telfair's overly expansive designation as a reference to: (a) Telfair's defense counsel engaged during the prosecution of <u>Telfair-DMC</u>; and (b) those Assistant United States Attorneys who have been prosecuting <u>Telfair-DMC</u> and <u>Gatling</u>.

The Court, therefore, assesses Telfair's claims accordingly and begins its analysis with the determination as to whether this matter should be referred to the OAE.

### 1.    The Option of Referring Telfair's Claims to the OAE Is Not Viable

As noted <u>supra</u>, Telfair's Form-II consists of a slightly altered replication of his Form-I and numerous attachments. Two of these attachments replicate letters from Mss. Maureen G. Bauman and Paula T. Granuzzo; both these letters are addressed to Mr. Jack Jay Wind, the Secretary for the

VI District Ethics Committee.  See Instant Matter, Docket Entry No. 2, at 36 and 39 (dated, respectively, March 18, 2010, and April 21, 2009).  Granuzzo's April 21, 2009, letter informed Wind of Telfair's "desire to file an ethics grievance against two attorneys," namely, Telfair's then-already-dismissed defense counsel, Bergrin and Kimball,[23] see id. at 39, while Bauman's letter informed Wind of Telfair's same desire as to Pedicini.[24]  See id. at 36.  Bauman and Granuzzo's letters also indicated  that: (a) Telfair filed his grievances against Bergrin, Kimball and Pedicini in the wrong Ethics Districts of the OAE; see id. at 36, 39; and (b) Telfair's grievances were forwarded, by Bauman and Granuzzo, to the correct Ethics District for Wind's "review [on merits] and, if appropriate, docketing and processing."  See id.

---

[23]  Bergrin was relieved from representing Telfair on or prior to October 10, 2008.  See Telfair-DMC, Docket Entry No. 7.  It appears that Kimball stopped representing Telfair on or shortly after Telfair's January 23, 2010, request to Judge Cavanaugh for change of Telfair's CJA, since that development was followed by Telfair's mailing of another letter to Kimball; that letter was filed on February 11, 2009, and was largely analogous to the original Letter-Kimbal except that the degree of Telfair's threats to Kimball was escalated.  See Telfair-DMC, Docket Entry No. 22 (Telfair's second letter, differing from Telfair-Kimball only in the sense that: (a) prior to the closing line reading, again, "[i]n closing, I hope we have a proper understanding counselor, I'll see you on or about the week of January 31, 2009!" Telfair added two sentences reading, "I do not want any motions, briefs, etc., submitted to any courts without me having the chance to review and/or my input!  If you are not interested, as your actions have illustrated throughout my legal process, please, just remove yourself from this case, I'm tired of wasting time"; and (b) at the top of that letter, Telfair added a heading reading "Third and FINAL NOTICE") (bolding removed, capitalization in original).

[24]  It appears that Pedicini was unaware of Telfair's filing of an ethics grievance with the OAE (or of Telfair's attempt to file a grievance against Pedicini with the New Jersey Lawyers' Fund for Client Protection); rather it appears that Pedicini's application to Judge Cavanaugh for relief from his appointment as Telfair's defense counsel was a result of Pedicini's learning (perhaps, as a result of being served with process) about the legal malpractice suit Telfair instituted against him in the state court.  See Instant Matter, Docket Entry No. 22, at 23 (indicating that Telfair's complaint to that effect was filed with the Superior Court of New Jersey, Law Division, on June 9, 2010).

In addition, Telfair's other Form-II attachment replicates one more letter from Granuzzo; that other Granuzzo's letter seems to refer to a different set of grievances, which Telfair filed with the OAE apparently sometime prior to July 17, 2009; it appears that this set of grievances asserted professional misconduct by Messrs. Minish and Matey, i.e., by the prosecutors who – at that time – were representing the United States in Telfair-DMC.[25]  See id. at 41 ("Granuzzo Letter").  The Granuzzo Letter reads, in pertinent part, as follows:

> [The OAE] is in receipt of your grievance forms you have filed against Joseph N. Minish, Esq. and Paul B. Matey, Esq.  Please be advised that the Supreme Court of New Jersey has established a policy of not considering any grievance received from a defendant in a criminal matter or person convicted of a crime, whether it alleges prosecutorial misconduct against the attorney who prosecuted such person, ineffective assistance of counsel by defense counsel or other unethical conduct by an attorney arising out of the criminal case until all available appellate remedies have been exhausted or until the time [to seek appellate review] has expired.

Id. (citing N.J. Court R. 1:20-3(f)).

Thus, the record – as it is presented by the attachments to the Form-II – suggests two possible scenarios, pursuant to which:

(a)     all Telfair's grievances filed with the OAE (that is, grievances filed against any defense counsel and against any prosecutor) would necessarily be subject to a certain OAE blanket policy, which bars screening on merits and discretional docketing.[26]  If so, this Court's

---

[25]  See USA v. Telfair, 07-cr-0272 (DMC) (the matter that gave rise to Telfair-DMC), Docket Entries Nos. 9, 34 and 37 (reflecting the fact that Assistant United States Attorney ("AUSA") Joseph N. Minish was assigned to represent the United States on February 5, 2008, joining AUSA Paul B. Matey who was assigned to Telfair's prosecution ab initio.  Minish and Matey were joined by AUSA Brian Lee Urbano (Telfair's current prosecutor in Telfair-DMC) on March 25, 2008.

[26]  Rule 1:20-3(f) provides, in pertinent part, that, "[i]f a grievance alleges facts that, if true, would constitute unethical conduct and if those facts are substantially similar to the material allegations of pending civil or criminal litigation, the grievance shall be docketed and

exercise of the referral-to-the-OAE option provided to the Court by the language of this

District's Local Civil Rule 104.1(e) would, facially, be a <u>non</u> <u>sequitur</u> since the OAE

blanket policy bar would effectively nullify any value of this Court's referral for years to

come (that is, until Telfair's direct appeal and collateral review under § 2255 either take full

course or become precluded by expiration of applicable limitations periods), hence,

transforming the Court's referral of this matter to the OAE into a hollow exercise in

etiquette; and

(b)     Telfair's grievances against *some* counsel involved in <u>Telfair-DMC</u> and <u>Gatling</u> might be

declined from docketing by the OAE in its discretion, while Telfair's grievances against

*other* counsel involved in the same criminal matters might, nonetheless, be examined by the

OAE on merits in its discretion (and declined docketing or proceeded to investigation

according to the merit determinations made).[27] <u>Compare</u> Instant Matter, Docket Entry No.

---

investigated if, in the opinion of [a designated OAE official], the facts alleged clearly
demonstrate provable ethical violations or if the facts alleged present a substantial threat of
imminent harm to the public.  All other grievances *involving* such related pending civil and
criminal litigation *may be declined* and not docketed."  N.J. Ct. R. 1:20-3(f) (emphasis supplied).
The Rule's resort to such terms as "involving" and "may be declined" suggests that, with regard
to grievances like those filed by Telfair, <u>i.e.</u>, grievances indirectly involving the grievant's
ongoing criminal prosecution, the OAE has discretion – rather than an obligation – to decline
docketing (which, in turn, suggests a prerequisite screening on merits).  However, Granuzzo's
reference to a certain OAE policy might be construed as indicating that the OAE adopted a
blanket prohibition on docketing of all grievances submitted by criminal defenders against their
counsel or against their prosecutors, regardless of the merits of the claims asserted in such
grievances. (If such policy was, in fact, adopted, the jurisdiction to assess the validity of such
blanket construction of the enabling Rule 1:20-3(f) mandate rests exclusively with the Supreme
Court of New Jersey, and this Court expresses no opinion about that matter).

[27]  Such flexible criteria is suggested by the cumulative effect of the following three
considerations: (a) since the language of New Jersey Court Rule 1:20-3(f) is set forth in
discretion-suggesting terms such as "may be docketed," it is plausible that the AOE policy
referred to in the <u>Granuzzo Letter</u> is also discretionary; (b) the fact of Granuzzo's forwarding of

2, at 39 to id. at 41 (Granuzzo's April 21, 2009, letters forwarding Telfair' grievances against Bergrin and Kimball for Wind's screening on merits but informing Telfair, on July 17, 2009, that Telfair's grievances against Minish and Matey would not be docketed). However, if so, this Court's reference of Telfair's submissions filed in the instant matter for the AOE's review would be facially superfluous simply because: (i) the AOE was already presented with the entire panoply of Telfair's allegations against his prosecutors and defense counsel, reached – or is in the process of reaching – its discretionary determinations as to whether or not to docket Telfair's grievances, and needs no reminders of the same from this Court; and, in any event (ii) this Court has no assurances that, under the OAE's discretionary policy, Telfair's grievances would even be screened on merits.

Concluding that the option of referring Telfair's allegations to the OAE would result in a superfluous exercise, this Court – being mindful of its ongoing responsibility to supervise the conduct of attorneys who are admitted to practice in this District, see L. Civ. R. 103.1 – finds it proper to conduct its own review of the merits of Telfair's allegations, in accordance with the

---

Telfair's grievances against Bergrin and Kimball to Wind for screening on merits, instead of outright notifying Telfair that – under the blanket policy bar – Telfair could not file a grievance against his defense counsel until his appellate review is concluded or becomes time-barred, similarly suggests that the OAE policy is discretionary rather than a blanket prohibition; and (c) the Granuzzo Letter does not indicate that the policy applies, in a blanket fashion, to a certain class of counsel, e.g., that it applies to the grievances against prosecutors but not those against defense counsel, or to state counsel but not federal attorneys, etc.  See Granuzzo Letter (informing Telfair of generic OAE's policy and suggesting that her conclusion – to the effect that Telfair's grievances against  Minish/Matey would not be docketed – was not a result of Minish and Matey's status as federal prosecutors, granted Granuzzo's statement reading, "[i]n the meanwhile, if you believe that your attorney(s) is (are) not properly representing you, you may communicate with the public defender's office and/or the criminal assignment judge in the county in which your matter is venued" and, hence, suggesting her impression that Minish and Matey were not AUSAs but Teflair's public defenders in a criminal prosecution by the State).

standard set forth in the Rules of Professional Conduct of the ABA ("RPC-ABA"), as modified by applicable federal statutes/regulations, interpreted by case law and affected by relevant rules of federal procedure.   See L. Civ. R. 103.1(a).

### 2.       Teflair's Allegation Do Not Merit a Disciplinary Investigation

#### a.       Telfair's Allegations Against His and Gatling's Prosecutors

Teflair's allegations against his and Gatling's prosecutors could be grouped into five categories: (a) the bulk of statements, which effectively express Telfair's opinion that the prosecutors are "harassing" him and Gatling by aggressively prosecuting the charges in Telfair-DMC and Gatling; (b) allegations that the prosecutors exposed Telfair to the danger of "double jeopardy" by filing superceding indictments; (c) claims based on the timing of the filing of complaint in Gatling and on the fact that the in-court parts of Gatling's criminal proceedings are underway; and (d) assertions that the prosecutors unduly capitalize of Gatling's "fears" of potential incarceration – or the length of such incarceration – by offering Gatling an opportunity to avoid the uncertainties of a criminal trial by taking a guilty plea that encompasses a prosecutorial recommendation of a reduced sentence; and (e) claims that, at the outset of Telfair's prosecution, the prosecutors unduly capitalized on Telfair's alleged affections for Gatling.  The Court will address these allegations seriatim.[28]

---

[28]  The Court's examination of Telfair's allegations against AUSAs is conducted with additional consideration of the prescripts of the Citizens Protection Act, 28 U.S.C. § 530B, and Ethical Standards and Principles of Federal Prosecution ("PFP") adopted by the United States Department of Justice ("DOJ") for the purpose of regulating the conduct of federal prosecutors. See http://www.justice.gov/opr/framework.pdf.  The DOJ's Office of Professional Responsibility clarified that the PFP standard imposed by the DOJ is rooted in many sources, i.e.,

> [federal] attorneys are subject[,] in the performance of their professional duties[,]
> to obligations and standards imposed by law, by applicable rules of professional

### i.      Zealous Prosecution

Telfair's main group of contentions (asserting that the prosecutors of his and Gatling's

criminal matters violated their professional responsibilities by zealously and diligently pursuing the

charges against Telfair and Gatling) is facially without merit.[29]  Indeed, such prosecutorial activities

were in compliance with ethical obligations.  In contrast, prosecutorial laxness would have been a

---

> conduct, and by [DOJ] regulations and policies . . . .  There are many sources of
> such obligations and standards, including the Constitution (e.g. . . . the Fourth,
> Fifth and Sixth Amendments . . . ), federal statutes (e.g. Jencks Act . . . ), case law
> (e.g. court opinions interpreting the Due Process Clause . . . ), court orders (e.g. a
> District Court's order on a motion in limine), rules of procedure (e.g.
> requirements in the Federal Rules of Civil Procedure and a District Court's rules .
> . . ), standards of conduct imposed by an attorney's licensing authority or by the
> jurisdiction in which the attorney is litigating (e.g. state rules of professional
> conduct . . . ), regulations issued by the Department and codified in the Code of
> Federal Regulations (e.g. the regulation concerning subpoenas to members of the
> news media), regulations codified in the Code of Federal Regulations . . . (e.g. the
> prohibition on the use of an employee's public office for private gain), and
> Department policies contained in the United States Attorney's Manual (e.g. the
> requirements imposed on prosecutors by the [PFP]).

Id.; see also 28 C.F.R. 77.3 ("In all criminal investigations and prosecutions, . . . attorneys
for the government shall conform their conduct . . . to the state rules and laws, and federal
local court rules, governing attorneys in each State where such attorney engages in that
attorney's duties, to the same extent and . . . manner as other attorneys in that State").

[29]  Moreover, even if this Court were to construe Telfair's allegations as an assertion of
prosecutorial vindictiveness, that assertion would also be unsupported by facts.  The government
is deemed engaged in prosecutorial vindictiveness if it is established that the prosecution engaged
in a conduct that would not have occurred but for the prosecution's desire to punish the defendant
for exercising a specific legal right.  See United States v. Contreras, 108 F.3d 1255, 1262 (10th
Cir.), cert. denied, 522 U.S. 839 (1997).  Here, Telfair's submissions do not suggest that he
exercised any specific legal right prompting his prosecutors to engage in a conduct that would
not have occurred had he not exercised that right.  Accord RPC-ABA D.R. 3.1 and comment 1
("A lawyer shall not bring . . . a proceeding, or assert . . . an issue therein, unless there is a basis
in law and fact for doing so that is not frivolous"; "The advocate has a duty to use legal
procedure for the fullest benefit of the client's cause").

violation of the prosecutors' professional responsibilities to their client, the United States.  See RPC-ABA, preamble, parts (2) and (4) ("As a representative of clients, . . . a lawyer [must] zealously assert[] the client's position under the rules of the adversary system"; "In all professional functions[,] a lawyer should be competent, prompt and diligent"); RPC-ABA, D.R. 1.3 ("A lawyer shall act with reasonable diligence and promptness in representing a client"); PPC-ABA, D.R. 1.3, comments 1 and 3 ("A lawyer should pursue a matter on behalf of a client despite opposition, obstruction or personal inconvenience to the lawyer, and take whatever lawful and ethical measures are required to vindicate a client's cause or endeavor. A lawyer must also act with commitment and dedication to the interests of the client and with zeal in advocacy upon the client's behalf. . . . Perhaps no professional shortcoming is more widely resented than procrastination").  Consequently, this line of Telfair's assertions warrant neither a disciplinary investigation nor even a lengthy discussion.

### ii.    "Double Jeopardy" Claims

Telfair's "double jeopardy" allegations (asserting that the prosecutors violated the prescripts of the Double Jeopardy Clause by filing superceding indictments) are equally without merit.

> The Double Jeopardy Clause forbids that "any person be subject for the same offence to be twice put in jeopardy of life or limb."  U.S. Const. amend. V.  Under that clause, a defendant has a "valued right to have his trial completed by a particular tribunal," Wade v. Hunter, 336 U.S. 684, 689 (1949) . . . .  Protections against double jeopardy are ancient and we interpret the Double Jeopardy Clause in light of "its origin and the line of its growth." Green v. United States, 355 U.S. 184, 199 (1957) (Frankfurter, J., dissenting) (quoting Gompers v. United States, 233 U.S. 604, 610 (1914)).  The Double Jeopardy Clause's prohibition of multiple *trials* evolved in reaction to "a time when English judges served the Stuart monarchs by exercising a power to discharge a jury whenever it appeared that the Crown's evidence would be insufficient to convict."  Washington, 434 U.S. at 507. Accordingly, a defendant may not be reprosecuted where a *first trial has ended with an improperly declared mistrial*.  United States v. Perez, 22 U.S. 579 (1824).

United States v. Rivera, 384 F.3d 49, 53-54 (3d Cir. 2004) (footnotes omitted, emphasis supplied).

Since neither Telfair nor Gatling have had a superceding *trial* or even a criminal charge *filed upon conclusion of the first trial*, the concept of double jeopardy is facially inapplicable to Telfair's claims.  At most, these allegations – if construed with creativity – could be read  as Telfair's desire to assert a claim of prosecutorial vindictiveness.  However, even so construed, Telfair's allegations are facially without merit, since the government's initial decision to charge does not limit the government's ability to seek a superseding indictment charging another offense.  See United States v. Sarracino, 340 F.3d 1148 (10th Cir. 2003), cert. denied sub nom. Cheresposy v. United States, 124 S. Ct. 1105 (2004).  Moreover, "a prosecutor may threaten to charge [by means of superceding indictment,] a greater offense if a defendant will not plead guilty to a lesser one, as long as the prosecutor has probable cause to believe that the defendant committed the greater offense."  Id. (citing Bordenkircher v. Hayes, 434 U.S. 357 (1978)); accord PFP, ¶ 9-27.230(6) (clarifying that, with regard to the issue of selecting the particular charges to be fostered by the prosecution, DOJ attorneys should consider the defendant's "willingness to cooperate in the investigation or prosecution of others").  Therefore, Telfair's references to his superceding indictments cannot warrant any disciplinary investigation in this District.

### iii.    Timing of Gatling's Prosecution and In-Court Proceedings

Another group of Telfair's allegations aims to assert that Gatling's prosecutors violated their professional responsibilities by: (a) initiating Gatling's proceedings in the context of what Telfair labels as wrongful arrests[30] and then conducting the out-of-court parts of Gatling's prosecution with

---

[30]  Numerous confusions plague Telfair's submissions made in this matter and in the underlying proceedings, such as Telfair-DMC and Telfair-WJM.  For instance, Telfair makes systemic allegations associated with Gatling's (and Telfair's own) arrests, even though these arrests were performed by DEA agents and police officers, who were not attorneys admitted to practice in this District and, hence, not amenable to this Court's disciplinary review.

what Telfair qualifies as an undue delay; or (b) proceeding with the in-court part of Gatling's prosecution too swiftly for Telfair's taste.  Same as Telfair's allegations discussed in the two previous subsections of this Opinion, this group of allegations is without merit.

The decision as to the timing of initiation of a criminal prosecution falls within prosecutorial discretion.  This issue was expressly addressed by the Supreme Court, which observed that

> [i]t requires no extended argument to establish that prosecutors do not deviate from "fundamental conceptions of justice" when they defer seeking indictments until they have probable cause to believe an accused is guilty; indeed it is unprofessional conduct for a prosecutor to recommend an indictment on less than probable cause. [See] ABA Code of Professional Responsibility DR 7-103(A); ABA Project on Standards for Criminal Justice, The Prosecution Function § 3.9 (App. Draft 1971). It should be equally obvious that prosecutors are under no duty to file charges as soon as probable cause exists but before they are satisfied they will be able to establish the suspect's guilt beyond a reasonable doubt.  To impose such a duty "would have a deleterious effect both upon the rights of the accused and upon the ability of society to protect itself," United States v. Ewell, [383 U.S. 116,] 120 [(1966)].  From the perspective of potential defendants, requiring prosecutions to commence when probable cause is established is undesirable because it would increase the likelihood of unwarranted charges being filed, and would add to the time during which defendants stand accused but untried.  [Indeed, t]o the extent that the period between accusation and trial has been strictly limited by legislative action, see, e.g., Speedy Trial Act . . . , 18 U.S.C. § 3161, compelling immediate prosecutions upon probable cause would not add to the time during which defendants stand accused, but would create a risk of guilty persons escaping punishment simply because the Government was unable to move from probable cause to guilt beyond a reasonable doubt in the short time available to it. . . . .
>
> [Moreover, f]rom the perspective of law enforcement officials, a requirement of immediate prosecution upon probable cause is equally unacceptable because it could make obtaining proof of guilt beyond a reasonable doubt impossible by causing potentially fruitful sources of information to evaporate before they are fully exploited.  Cf. United States v. Watson, 423 U.S. 411, 431 (1976)  (Powell, J., concurring) ("Good police practice often requires postponing an arrest, even after probable cause has been established, in order to place the suspect under surveillance or otherwise develop further evidence necessary to prove guilt to a jury").   And from the standpoint of the courts, such a requirement is unwise because it would cause scarce resources to be consumed on cases that prove to be insubstantial, or that involve only some of the responsible parties or some of the criminal acts.  Thus, no one's interests would be well served by compelling prosecutors to initiate prosecutions as soon as they are legally entitled to do so.  See also Hoffa v. United

States, 385 U.S. 293, 310 (1966), quoted in United States v. Marion, 404 U.S. at 325
n. 18 [(stating that "t]here is no constitutional right to be arrested.  The police are
not required to guess at their peril the precise moment at which they have probable
cause to arrest a suspect, risking a violation of the Fourth Amendment if they act too
soon, and a violation of the Sixth Amendment if they wait too long.  Law
enforcement officers are under no constitutional duty to call a halt to a criminal
investigation the moment they have the minimum evidence to establish probable
cause, a quantum of evidence which may fall far short of the amount necessary to
support a criminal conviction"[).]

United States v. Lovasco, 431 U.S. 783, 791 (footnoted 9 to 11, and footnote 13 are incorporated

in the main text); see also PFP, ¶ 9-27.200, comment ("Merely because this requirement [of

probable cause] can be met in a given case does not automatically warrant prosecution; further

investigation may be warranted, and the prosecutor should still take into account all relevant

considerations"); accord id. ¶¶ 9-27.220 and 9-29.230 (noting that the issues associated with the

decision to initiate criminal prosecution are assessed in light of, inter alia, federal law enforcement

priorities, the nature and seriousness of the offense, the deterrent effect of prosecution, the person's

culpability in connection with the offense and his/her history with respect to criminal activity, as

well as his/her willingness to cooperate in the investigation or prosecution of others).

  In light of these considerations, the timing of the prosecutorial decision as to when to file

a criminal complaint against Gatling (which was filed a few months after Telfair's arrest and,

seemingly, in conjunction with Gatling's re-arrest) should not be second-guessed by this Court and

cannot provide this Court with a basis for a disciplinary investigation.

  Similarly, Telfair's assertions that the in-court part of Gatling proceeding began "too soon"

after the filing of criminal complaint in Gatling does not provide a valid basis for initiation of a

disciplinary investigation.  The criminal complaint giving rise to Gatling was filed on March 9,

2007, and – within just four days – Gatling was arrested and released on bail.  See Gatling, Docket

Entries Nos. 1-5.  Gatling's initial indictment was filed on March 18, 2010, that is, three years later

(hence, triggering the in-court part of her prosecution), with Gatling applying for permission to

plead guilty on August 3, 2010, that is, four and a half months later.  See Gatling, Docket Entries

Nos. 28, 33-37.  This time line indicates, in no ambiguous terms, that Telfair's claim of "unduly

swift" prosecution of Gatling is without merit; indeed, a prosecutor's attempts to halt, obstruct or

procrastinate Gatling could amount to a violation of Gatling's right to a speedy trial (and, in

addition, a violation of the prosecutor's ethical obligations).  See 18 U.S.C. § 3161 (a) (directing

"set[ting] the case for trial on a day certain or [on] other short-term calendar . . . so as to assure a

speedy trial"); accord PFP ¶ 9-27.420, comment 11 ("the attorney for the government should

consider the state of the criminal docket and the speedy trial requirements in the district . . . and the

work loads of prosecutors, judges, and defense attorneys in the district"); cf. RPC-ABA D.R. 1.3,

comment 3 ("no professional shortcoming is more widely resented than procrastination"); RPC-

ABA D.R. 3.2 and comment ("A lawyer shall make reasonable efforts to expedite litigation

consistent with the interests of the client . . .").

Consequently, Telfair's assertions related to the timing of prosecutorial activities in Gatling

do not warrant this Court's initiation of a disciplinary investigation.

### iv.    Plea Offer

Next group of Telfair's allegations is based on Telfair's speculations that Gatling's

prosecutors are unduly capitalizing on Gatling's "fears" of imprisonment (or of a lengthy term of

imprisonment).  In making these assertions, Telfair: (a) deduces his conclusion from the sole fact

that the prosecutors in Gatling offered Gatling a plea; and (b) accompanies his deduction with his

speculation that such prosecutorial plea offer must be a sign of the prosecutor's "wedging" on

Gatling's concern about the future of her children in the event Gatling is imprisoned.  In other words, Telfair guesses that the prosecutorial offering of these favorable considerations must be an ethical violation on the part of the prosecutors simply because the attractiveness of the offer could be preventing Gatling from focusing, to the degree Telfair would prefer, on the possibility of obtaining full acquittal at trial.

      Telfair's argument is without merit.  Taken to its logical conclusion, Telfair's position suggests that any plea offer is ethical only if it: (a) offers the defendant withdrawal of all charges; or (b) virtually removes the defendant's incentive to take a guilty plea by offering the defendant the very same penal consequences that the defendant would get as a result of being convicted at his/her criminal trial on all charges and sentenced to the maximum sentence applicable.

      The "(a)" alternative of Telfair's position is flawed both logically and legally because a plea agreement, by definition, cannot offer withdrawal of all charges[31] and, in addition, would be contractually invalid for lack of consideration on the part of the defendant.[32]  Telfair's "(b)" argument fares no better, analogously containing logical and legal flaws, since any plea agreement,

---

[31]   Plea agreement differs from an agreement not to prosecute which, on occasion, might be offered in reciprocity for a particularly valuable cooperation with law enforcement actions. See infra, this Opinion, at 65-66.

[32]   If the Court were to hypothesize that Telfair envisioned a *plea* agreement guaranteeing Gatling a sentence other than imprisonment, such plea offer would be contrary to the dictates of rules of attorney ethics: a prosecutor cannot guarantee the defendant any particular sentence (since the sentencing aspect falls entirely within the province judicial discretion), and – in addition – prosecutors are obligated to seek a punishment corresponding to the criminal offense the defendant is charge with.  See PFP 9-27.430 and comments 1 and 3 (providing that "pursuant to a plea agreement, the defendant should be required to plead to . . . charges [t]hat [are] the most serious [or] readily provable, [and have] an adequate factual basis. . . .  To the extent that the plea agreement requires the government to take a position with respect to the sentence to be imposed, there should be little danger since the court will not be bound by the government's position").

by definition, envisions a prosecutor-created incentive for the defendant to accept the plea, see United States v. Wright, 289 Fed. App'x 543, 546 (3d Cir. 2008) ("government[ has a] legitimate interest in providing an *incentive for defendants to plead guilty*, [which is] enabling the government to more efficiently prosecute its  cases") (emphasis supplied), and – without such incentive – any plea agreement would be contractually invalid for lack consideration on the part of the government.

Under Boykin v. Alabama, 395 U.S. 238 (1969), its progeny, and Rule 11 of the Federal Rules of Criminal Procedure, a guilty plea is invalid only if it is not the result of the defendant's knowing and voluntary waiver of his/her rights (or if the offered plea has no factual basis).  Here, Telfair seems to suggest that Gatling's decision to accept the plea offer cannot be voluntary simply because Gatling's train of thought might have shifted from sole hopes for acquittal at trial to factoring in and weighing upon the cost-benefit analysis of the plea agreement offered.  Such position is facially without merit.

> [W]hen we . . . considered the meaning of a "voluntar[iness" of a] guilty plea, we
> [utilized] the standards of "voluntariness" developed in the coerced-confession
> cases.  See Brady v. United States, 397 U.S. 742, 749. [The relevant case law]
> yield[s] no talismanic definition of "voluntariness," mechanically applicable to the
> host of situations where the question has arisen.  "The notion of 'voluntariness,'" Mr.
> Justice Frankfurter once wrote, "is itself an amphibian." Culombe v. Connecticut,
> 367 U.S. 568, 604-605 [(1961)].  It cannot be taken literally to mean a "knowing"
> choice.  "Except where a person is unconscious or drugged or otherwise lacks
> capacity for conscious choice, all [his/her] statements -- even those made under
> brutal treatment -- are 'voluntary' in the sense of representing a choice of
> alternatives.  On the other hand, if 'voluntariness' incorporates notions of 'but-for'
> cause, the question should be whether the statement would have been made even
> absent inquiry or other official action. Under such a test, virtually no statement
> would be voluntary because very few people [make] statements in the absence of
> official action of some kind." Bator & Vorenberg, Arrest, Detention, Interrogation
> and the Right to Counsel: Basic Problems and Possible Legislative Solutions, 66
> Col. L. Rev. 62, 72-73; see also 3 J. Wigmore, Evidence § 826 (J. Chadbourn, rev.
> 1970).  It is thus evident that neither linguistics nor epistemology will provide a
> ready definition of the meaning of "voluntariness."  Rather, "voluntariness" has
> reflected an accommodation of the complex of values implicated [by the process of

examining the defendant's options].

Schneckloth v. Bustamonte, 412 U.S. 218, 224-25 (footnotes 6 and 7 incorporated into the main text, parenthetical quotation omitted); see also Brady, 397 U.S. at 757 ("The voluntariness of [the defendant's] plea can be determined only by considering *all of the relevant circumstances surrounding it*.   One of these circumstances *was the possibility of a heavier sentence* following a guilty verdict after a trial.  It may be that [the defendant], faced with a strong case against him and recognizing that his[/her] chances for acquittal were slight, preferred to plead guilty and thus limit the penalty . . . rather than to elect a jury trial which could result in a [heavier] penalty.  But even if we assume that [the defendant] would not have pleaded guilty except for [his/her fears of a heavier] penalty . . . , this assumption merely identifies the penalty provision as a 'but for' cause of his plea [and] does not necessarily [mean] that the plea was coerced and invalid as an involuntary act") (citing Haynes v. Washington, 373 U.S. 503, 513 (1963); Leyra v. Denno, 347 U.S. 556, 558 (1954), footnote omitted, emphasis supplied); accord PFP, 9-27.430, comments 1-3 (outlining the considerations underlying the choice of incentives a prosecutor may ethically offer to defendant).

Here, the fact that the plea agreement offered by Gatling's prosecutors contained incentives – in the form of a lesser charge and prosecutorial recommendation of a lesser penalty – could not render Gatling's process of considering that offer "involuntary" under the holdings of Schneckloth and Brady.  Indeed, it was proper for Gatling to factor in the values of the plea bargain offer into her considerations, same as it was proper for her to conduct her analysis in the context of the impact her potential conviction at trial (and the possibility of imposition of the maximum applicable prison sentence) might have on her children.  The very same considerations *had to be entertained* by Gatling's prosecutors under PFP  9-27.430, comment 3, which states that "the prosecutor should

take into account the purposes of sentencing, the penalties provided in the applicable statutes (including mandatory minimum penalties), the gravity of the offense, any aggravating or mitigating factors, and any post conviction consequences to which the defendant may be subject."

Thus, while it was Gatling's right to accept or reject the terms of the offered plea agreement, the very fact of the prosecutors' making an attractive plea offer cannot be construed as an unethical conduct. In light of the foregoing, Telfair's assertions suggesting that Gatling's prosecutors violated their ethical obligations by offering, for Gatling's considerations, terms more favorable than the outcome Gatling might be facing upon losing her criminal trial, cannot warrant this Court's initiation of a disciplinary investigation.

### v. Claims that the Prosecutors Use Gatling as "Leverage"

Two cryptic statements made by Telfair seem to assert that the prosecutors unduly capitalized on his affections for Gatling. See Form-I, at 5 and 13 (asserting that his arrest involved "implementation of excessive force using Gatling as collateral" and that "[t]he derivative - tort, ex post facto, and the ex delicto stems from Gatling being used as collateral and is now being used as a unilateral punishment for [Telfair] where the government is trying to dissolve Gatling's litigation").

While the matters associated with Telfair or Gatling's arrests by the DEA agents and Newark police have no relation to attorneys' disciplinary proceeding, this Court – construing Telfair's assertions leniently – presumes that Telfair: (a) either aims to allege that his prosecutors offered him not to prosecute Gatling in reciprocation for Telfair's cooperation with a certain DEA investigation of drug trafficking or, alternatively, Telfair speculates that the prosecutors might have been contemplating making such an offer, and (b) concludes that the prosecutorial offer or a mere

consideration of making such offer was a violation of the rules of ethics.  See id. at 19 (alleging that

"Gatling blames [Telfair] for the action taken by the arresting officials and the actions furthered by

the government, where she have been led to believe that if [Telfair] would have become an

informant for the government she would not be involve in this legal process").

If the Court deciphered Telfair's claims correctly, these claims could be reduced to a

statement that Telfair's prosecutors made or were considering making Telfair a "packaged plea"

offer.  However, neither prosecutorial consideration of such alternative nor an actual offer violates

ethical requirements.  Addressing this issue, the Court of Appeals explained that

> [t]here is no question that package deal plea bargains are constitutional.  See [United
> States v.] Pollard, [959 F.2d 1011,] 1021-22 [ (D.C. Cir. 1992),] (citations omitted).
> That conclusion is nearly axiomatic given the nature of our criminal justice system,
> of which plea bargains are an "essential part."  Santobello [v. New York,] 404 U.S.
> [257,] 261 [(1971)]; see also Blackledge v. Allison, 431 U.S. 63, 71 (1977). "While
> confronting a defendant with the risk of more severe punishment clearly may have
> a discouraging effect on the defendant's assertion of his trial rights," the Supreme
> Court has explained, "the imposition of these difficult choices [is] an inevitable -
> and permissible - attribute of any legitimate system which tolerates and encourages
> the negotiation of pleas."  Bordenkircher [v. Hayes, 434 U.S. 357,] 364 [(1977)].
> In turn, the Second Circuit has noted that, "since a defendant's plea is not rendered
> involuntary because he enters it to save himself many years in prison, it is difficult
> to see why the law should not permit a defendant to negotiate a plea that confers a
> similar benefit on others."  [United States v.] Marquez, 909 F.2d [738,] 742 [(2d
> Cir. 1990)].  We agree and hold that package deal plea bargains are constitutionally
> permissible.  See [United States v.] Seligsohn, 981 F.2d [1418,] 1426 [(3d Cir.
> 1992)].

United States v. Hodge, 412 F.3d 479, 490 (3d Cir. 2005); see also United States v. Nuckols, 606

F.2d 566, 569 (5th Cir. 1979) ("[there is] no intrinsic constitutional infirmity in broadening plea

negotiations so as to permit third party beneficiaries.  It is generally within a prosecutor's discretion

merely to inform an accused that an implicated third person 'will be brought to book if [the

accused] does not plead guilty. . . . If [the] accused elects to sacrifice himself for such motives, that

is his choice ") (quoting <u>Kent v. United States</u>, 272 F.2d 795, 798 (1st Cir. 1959), parenthetical

removed).

  While the Court of Appeals also guided that "package deal pleas pose special risks," <u>Hodge</u>,

412 F.3d at 491, the special risk referred-to in <u>Hodge</u> is present only in a scenario where the

defendant actually *accepts* a packaged plea benefitting another criminal defendant (or a person who

might be validly charged with a criminal offense).[33] <u>Accord</u> ALI Model Code of Pre-Arraignment

Procedure, Commentary to § 350.3(d) (1975) (explaining that the legal community is concerned

with the possibility of  greater danger of coercion in such situations and, accordingly, special care

must be taken to ascertain the voluntariness of the guilty plea).  Here, however, Telfair *did not*

accept any plea and was tried to and found guilty by a jury.  Therefore, the concerns associated with

one's acceptance of a package deal plea agreement are facially inapplicable to the issues at hand.

<u>See</u>, <u>e.g.</u>, <u>United States v. Castello</u>, 724 F.2d 813, 815 (9th Cir. 1984) (clarifying that the federal

courts never went so far as to conclude that "third party threats or promises are coercive <u>per se</u>.

Rather, they have held that the trial court should make a more careful examination of the

voluntariness of a plea when it is induced by such threats or promises") (citing <u>United States v.</u>

<u>Usher</u>, 703 F.2d 956, 958 (6th Cir. 1983); <u>Harman v. Mohn</u>, 683 F.2d 834, 838 (4th Cir. 1982);

<u>Nuckols</u>, 606 F.2d at 569; and <u>United States v. Tursi</u>, 576 F.2d 396, 398 (1st Cir. 1978)).

  It follows that, even if this Court were to hypothesize that the prosecutors did actually offer

---

  [33] Since Gatling was, in fact, duly charged with harboring a felon and obstruction of
justice (for providing Telfair abode while knowing there was an outstanding arrest warrant
against Telfair, and for making untruthful statements to the DEA agents during her first and
second interview) and applied for Judge Cavanaugh's permission to plea guilty to the harboring a
felon charge, there appears to be no dispute that there was factual basis for Gatling's prosecution.

Telfair a plea agreement that envisioned extra-lenient treatment of Gatling (including, potentially, non-prosecution of Gatling) in exchange for Telfair's assistance to the DEA, such offer could not violate the prosecutor's professional obligations. Accord PFP, 9-27.230, comment 9 ("A person's willingness to cooperate in the investigation or prosecution of others is another appropriate consideration in the determination whether a Federal prosecution should be undertaken. Generally speaking, a willingness to cooperate should not by itself relieve a person of criminal liability. There may be some cases, however, in which the value of a person's cooperation clearly outweighs the Federal interest in prosecuting him/her"); PFP, 9-27.420(A)(1) and comment 1 ("In determining whether it would be appropriate to enter into a plea agreement, the attorney for the government should weigh all relevant considerations, including [t]he defendant's willingness to cooperate in the investigation or prosecution of others. . . . The defendant's willingness to provide timely and useful cooperation as part of his/her plea agreement should be given serious consideration. The weight it deserves will vary, of course, depending on the nature and value of the cooperation offered and whether the same benefit can be obtained without having to make the charge or sentence concession that would be involved in a plea agreement"); PFP, 9-27.600 and comment 1(d) ("Except as hereafter provided, the attorney for the government may, with supervisory approval, enter into a non-prosecution agreement in exchange for a person's cooperation when, in his/her judgment, the person's timely cooperation appears to be necessary to the public interest and other means of obtaining the desired cooperation are unavailable or would not be effective. . . . [T]here may be cases in which it is impossible or impractical to employ [other] methods . . . to secure the necessary information or other assistance, and in which the person is willing to cooperate only in return for an agreement that he/she [or another person] will not be prosecuted at all for what he/she has done.

Page 63 of  84

[Such plea offers are proper if, inter alia,] there [are] no effective means of obtaining the person's timely cooperation short of entering into a non-prosecution agreement [and the cooperation is essential or valuable enough to justify such agreement]").  Therefore, Telfair's assertions that his prosecutors offered (or considered offering) Telfair a plea agreement favorably affecting Gatling's prosecution cannot merit initiation of a disciplinary investigation.

Since Telfair's allegations neither suggest that his or Gatling's prosecutors committed violations of their ethical obligations nor indicate that Telfair can elaborate on his already submitted hundreds of pages by asserting facts capable of materially changing this Court's analysis, the Court concludes that no disciplinary investigation against Telfair and Gatling's prosecutors shall be initiated, and no leave to amend Telfair's assertions against these prosecutors shall be granted.

**b.       Telfair's Allegations Against His Defense Attorneys**

Certain parts of Telfair's submissions are dedicated to Telfair's expressions of displeasure with his defense counsel.  The best this Court can surmise, it appears that Telfair's displeasure ensues from the fact that his defense attorneys did not submit every application (or did not make every argument) that Telfair proposed.  See Letter-Kimball ("I'm kindly warning you, to do what needs to be done so that all these violations of law(s) can and will be addressed, rather by way of my present appeal, or by starting to actually put up a fight in my case. . . .  For example: the word, supersede simply means, to make void, or repeal by taking the place of.   Now what is bothering me is that you have allowed this error in facts and/or errors in laws to go uncontested, as it pertains to my now newly 2-count indictment which is a serious double jeopardy violation, and is the reckless act of multiplicity in the first instance.   . . . So I will keep this easily to the point, . . .  I want to see the documentations/credentials of all parties being requested"); see also Telfair-DMC,

Docket Entry No. 22 (Telfair's second letter to Kimball, which includes Telfair's statement, "I do not want any motions, briefs, etc., submitted to any courts without me having the chance to review and/or my input!").

The Court, therefore, reads Telfair's assertions as aiming to challenge his defense counsel's candor and professional competence.[34]  Specifically, it appears that Telfair deduced his counsel incompetence/insufficiency of candor from his counsel's decisions not to file unspecified-by-Telfair all "pertinent motions," desired by Telfair "memorandum in support of laws and erred fact" and "appellate type motions," as well as such applications as "motion to remove a.k.a.," "[an application based on the] silver platter doctrine," "[an application based on the phrase] falsus in uno," "[an

---

[34]  Although no statement made in Telfair's voluminous submissions suggests Telfair's allegations that his attorneys were operating while under conflict of interest, this Court – solely out of abundance of caution – finds it proper to address that issue, at least in passing.  Here, the record in Telfair-DMC unambiguously indicates that – once Telfair was requesting Judge Cavanaugh to change his CJA, or once his defense counsel were learning about Telfair's filings of legal malpractice suits against them, or were in receipt of Telfair's letters directing them to "just remove yourself from this case," Telfair's defense attorneys ceased representing him.  See, e.g., See Telfair-DMC, Docket Entry No. 72.  Therefore, the only issue worthy of mentioning is the one associated with these attorney's representation of Telfair during the periods when Telfair was threatening them with future "firing."  See, e.g., Letter-Kimball (informing Kimball, inter alia, "that [Telfair does not] plan to quit fighting, even if that means firing [Kimball]").  However, an attorney's continuous representation of the client who threatens the attorney with the danger of future termination of appointment (or with the danger of having a disciplinary grievance filed against that attorney) does not introduce an actual conflict of interest into the attorney's conduct.  See, e.g., United States v. Rodriguez, 2010 U.S. App. LEXIS 15065, at *12 (8th Cir. July 22, 2010) (finding no conflict of interest on the part of defense attorney whose client threatened him with filing a disciplinary grievance, since "appointed counsel could not have 'gleaned any advantage for himself in disciplinary proceedings before the state bar by failing to employ his best exertions on the [defendant's] behalf at trial'") (quoting United States v. Burns, 990 F.2d 1426, 1438 (4th Cir. 1993), and citing Winfield v. Roper, 460 F.3d 1026, 1040 (8th Cir. 2006), Carter v. Armontrout, 929 F.2d 1294, 1299-1300 (8th Cir. 1991), and Smith v. Lockhart, 923 F.2d 1314, 1321 n.11 (8th Cir. 1991), in support of the conclusion that "any holding implying that defendants can manufacture conflicts of interest by initiating lawsuits against their attorneys" is laden with the danger of overreaching, and a true conflict arises only if the pending suit in fact puts the defendant against his attorney).

application based on the phrase] mens rea," "[an application based on the] stare decisis doctrine,"

"[an] address [asserting] DEA fraud & misconduct/fraud of the prosecutor(s)," "[an application for]

protection type order for the client & client's family," etc.  See  Telfair-DMC, Docket Entry No.

30.

Telfair's allegations do not suggest that his defense counsel violated their professional

responsibilities.  The RPC-ABA contains the following pertinent guidance:

> A lawyer shall provide competent representation to a client. . . .  A lawyer must .
> . . act with commitment and dedication to the interests of the client and with zeal in
> advocacy upon the client's behalf.  A lawyer is not bound, however, to press for
> every advantage that might be realized for a client.  For example, a lawyer may have
> authority to exercise professional discretion in determining the means by which a
> matter should be pursued. . . .  A lawyer shall not . . . assert . . . an issue . . . unless
> there is a basis in law and fact for doing so that is not frivolous . . . .  The advocate
> has a duty . . . not to abuse legal procedure.  The law, both procedural and
> substantive, establishes the limits within which an advocate may proceed.   . . .
> What is required of lawyers . . . is that they inform themselves about the facts of
> their clients' cases and the applicable law and determine [whether] they can make
> good faith arguments in support of their clients' positions. . . .  The [lawyer's] action
> is frivolous . . . if the lawyer is unable either to make a good faith argument on the
> merits of the action taken or to support the action taken by a good faith argument .
> . . .  A lawyer shall not knowingly . . . make a false statement of fact or law . . . .

RPC-ABA, D.R. Nos. 1.1,  1.2(a),  2.1,  3.1,  3.3(a)(1) and comments 1 and 2 to D.R. 3.1; accord

http://www.judiciary.state.nj.us/oae/atty_disc/atty_disc.htm (reflecting OAE guidance to litigants

that their lawyers' "disagreement about how a case should be handled –  or should have been

handled –  does not constitute unethical conduct, even if the outcome of the case is disappointing

[for the lawyer's client.  Indeed, t]here [might be] situations that a client may find most annoying

. . . that [would] not constitute unethical conduct. An example would be the lawyer's failure to

consult with the client prior to writing every letter or prior to filing every document in the client's

case").

Under that standard, it appears that the defense counsel's compliance – rather than non-

compliance – with Telfair's above-quoted demands would violate those attorneys' obligation to *not*

submit frivolous applications.    Indeed, had Telfair's counsel submitted such documents as

memoranda of "erred facts"  or "motion to remove a.k.a.," or applications based on such Latin

phrases as "falsus in uno," "mens rea" and "stare decisis doctrine," or a flood of interlocatory

appeals, these attorneys could have been rebuked for abuse of process and might have even faced

court sanctions.[35]  Analogously, Telfair's demands that his counsel would seek a "protection type

_____

[35]  Latin maxim "falsus in uno, falsus in omnibus" is neither a provision adopted by
means of any United States statute, regulation, etc., nor a legal canon of any kind.  Literally
translated into English as "false in one thing, false in everything," the maxim: (a) prompts logical
caution as to the entirety of the position taken by the speaker who, as part of his/her position,
misrepresents a certain fact; and, as such, (b) has been adopted into the panoply of policies of
American jurisprudence related to the propriety of findings made by the trier of fact.  See
Kanawha & M. R. Co. v. Kerse, 239 U.S. 576, 581 (1916); Telephone Cases, 126 U.S. 1 (1888)
("[The falsus in uno, falsus in omnibus] rule does not necessarily mean that the man who falsifies
once is a liar; but it means that justice will not rest on testimony a substantial part of which is
proved to be false"); Hargrave v. Stockloss, 127 N.J.L. 262 (N.J. (Ct. E. & App.) 1941)
(explaining that the maxim is not a rule of law but a guidance that – if testimony of a witness on
a material issue is willfully false and given with an intention to deceive, the jurors may disregard
the entirety of that witness' testimony).  Since Telfair was demanding from his counsel to make
applications based on this Latin maxim prior to Telfair's trier of fact even having a chance to
assess any witness testimony, such applications would be facially nonsensical.  Telfair's
reference to the concept of mens rea fares no better.  This Latin term, literally translated into
English as "guilty mind," is incorporated into American penal jurisprudence as "a general
presumption that the specified [state of mind must be established beyond reasonable doubt to]
appl[y] to all the elements of an offense" when the prosecutor makes his/her case to the trier of
fact, i.e., the jurors (unless the defendant elects in favor of a bench trial, which was not the case
with Telfair).  See Flores-Figueroa v. United States, 129 S. Ct. 1886, 1895 (2009) (Alito, J.,
concurring).  Since any argument by Telfair's defense counsel aiming to obtain Judge
Cavanaugh's finding that Telfair operated without the requisite mens rea would, effectively, be
an attempt to strip Telfair from his right to a jury trial, it is hardly surprising that Telfair's
counsel did not make such applications flying in the face of the Sixth Amendment.  Analogously,
Telfair's interest in Latin terminology reflected in his demand to his counsel to make "stare
decisis" applications is equally nonsensical.  Deriving its name from Latin maxim "stare decisis
et non quieta movere" (meaning, in English, "to stand by things decided, and not to disturb
settled points"), the doctrine of stare decisis is a principle that a controlling precedent by a

order for the client & client's family" were divorced from the realities of law.[36]  By the same token, while Telfair might have preferred to have certain physical evidence excluded, his sheer preference for such a turn of his prosecution could not qualify as a valid basis for his counsel's motion to suppress.[37]  Indeed, if so, Telfair's defense counsel were obligated *not* to submit such applications.

---

superior court is binding upon the lower courts, see, e.g., Briley v. City of Trenton, 164 F.R.D. 26, 29 (D.N.J. 1995), rather than a particular right of a federal criminal defendant; the principle is an indelible part of American jurisprudence, and it is employed equally by state and federal judiciary with regard to all litigants, be they civil or criminal, defendants and plaintiffs alike. Therefore, an application by Telfair's defense counsel reminding Judge Cavanaugh that he was bound to render his decisions in accordance with the principle of stare decisis would be equal to reminding Judge Cavanaugh of one of the basic axioms of American jurisprudence, and wholly unnecessary.

[36]  The term "protection order" means any injunction issued for the purpose of preventing future violent or threatening acts.  See, e.g., Szalai v. Holder, 572 F.3d 975, 979 (9th Cir. 2009). Since such orders are issued to prevent violence, harassment, stalking, etc. by *private citizens*, see id.; see also Nicole M. Quester, Refusing to Remove an Obstacle to the Remedy: The Supreme Court's Decision in *Town of Castle Rock v. Gonzales* Continues to Deny Domestic Violence Victims Meaningful Recourse, 40 Akron L. Rev. 391, 399 and nn. 69-74 (2007) (tracing the history ad aim of protection orders), the device has nothing in common with halting or ceasing one's criminal prosecution by the *government*, i.e., the goal Telfair hoped to attain.

[37]  The rationale of Telfair's demands to his counsel to make applications based on the "silver platter doctrine" escapes this Court.  Half-a-century ago, the Supreme Court adopted the term by ruling, in Elkins v. United States, 364 U.S. 206 (1960), that evidence obtained by state officers in violation of the Fourth Amendment could not be introduced against a defendant in a federal criminal trial.  That position was a broadening of the holding reached in Weeks v. United States, 232 U.S. 383 (1914), where the Court held that evidence obtained by federal officials in violation of the Fourth Amendment cannot be used against a defendant in a federal criminal proceeding; that rule eventually became part of Fourth Amendment concepts and policies jointly comprising the exclusionary rule which, in turn, gives base to suppression motions.  See, e.g., United States v. Crandell, 554 F.3d 79, 83 (3d Cir. 2009) (quoting Terry v. Ohio, 392 U.S. 1, 12 (1968), for clarification that the term "exclusionary rule" implicates, "[i]n the evidentiary context of the defendant's criminal trial, [a determination as to] the admissibility against a defendant of the evidence uncovered by the search and seizure"); United States v. Berry, 369 F.2d 386, 387 (3d Cir. 1966) ("[t]he ground for the motion to suppress [might be] the well established rule that evidence obtained as the result of an illegal arrest or search is inadmissible in a prosecution for a criminal offense").  However, Telfair's arrest was conducted on the basis of a valid arrest warrant, and his search was incidental to that arrest; plus, the search of the premises of Telfair's associates in drug trafficking was conducted pursuant to a 911 call informing the police about

See  RPC-ABA, D.R. Nos. 2.1,  3.1,  3.3(a)(1) and comments 1 and 2 to D.R. 3.1 (guiding against abuse of process and submission of frivolous applications having no valid basis in fact or in law); accord http://www.judiciary.state.nj.us/oae/atty_disc/atty_disc.htm ("[the lawyer's] disagreement about how a case should be handled . . . does not constitute unethical conduct, even if the outcome of the case is disappointing [and the lawyer's client elects to attribute such outcome to] the lawyer's failure to consult with the client prior to writing every letter or prior to filing every document in the client's case").

In light of the fact that neither the content of Telfair's submissions made in this matter (including the almost-three-hundred pages of his Motion) nor the records accumulated in Telfair-DMC or Gatling suggest that, in the event he is given leave to file a bona fide disciplinary grievance, Telfair would be able to articulate facts: (a) omitted from his submissions made in this matter and in Telfair-DMC (as well as in Telfair-WJM, Telfair-DMC-Civil and Telfair-SDW); and, in addition  (b) indicating that the initiation of a disciplinary investigation might be warranted, this Court concludes that granting Telfair leave to file a bona fide grievance would be futile.

Consequently – and taking notice of Telfair's request for "allow[ing him a basis] to file a meaningful interlocutory appeal," Instant Matter, Docket Entry No. 6, at 53, – this Court will: (a) re-dismiss civil and habeas challenges; (b) decline initiation of a disciplinary investigation; and (c) issue an Order conclusively withdrawing the Court's jurisdiction over the instant matter, hence ripening Telfair's right to appeal.

---

gunfire and the ensuing police investigation of these gun shots.  Hence, this Court is unclear as to on what grounds could Telfair's counsel make a non-frivolous suppression motion.

## VI.    TELFAIR'S LITIGATION PRACTICES WARRANT AN ORDER OF PRECLUSION

While Telfair's assertions – be they construed as civil claims, habeas challenges or an ethics grievance – warrant no relief or disciplinary investigation, Telfair's litigation practices, as they were manifested in <u>Telfair-DMC-Civil</u>, <u>Telfair-WJM</u> and <u>Telfair-SDW</u>, the instant matter and, especially, in <u>Telfair-DMC</u>, cause this Court grave concern in light of Telfair's apparent inability to control his litigation urges, which prompted Telfair's dozens of repetitive submissions of the same documents, his numerous restatements of dismissed claims, his apparent disregard for judicial decisions, and which, seemingly, fuel Telfair's propensity to draft overly-voluminous submissions ridden with multitudes of references to legal concepts and Latin terminology both inapplicable to Telfair's circumstances and having no substance.

### A.    Abuse of Legal Process By Recreational Litigation

The courts in this nation stand ready to address challenges brought by litigants in good faith. Which, in turn, means that the judiciary – including the Judges in this District – expect litigants to treat their litigation with utmost seriousness, without abusing legal process[38] and without unduly

---

[38]   The term "abuse of process" implies a litigant's improper use or perversion of legal process through actions undertaken for the purpose other than that intended by the law to effect, <u>see</u>, <u>e.g.</u>, <u>Bd. of Educ. v. Farmingdale Classroom Teachers Ass'n, Local 1889</u>, 38 N.Y.2d 397 (N.Y. 1975); <u>Wesko v. G. E. M., Inc.</u>, 272 Md. 192 (1974); <u>see</u> <u>also</u> David K. Godschalk, <u>Protected Petitioning or Unlawful Retaliation?</u>, 27 Pepp. L. Rev. 477 (2000) (discussing the Statute of Marlbridge, which incorporated the first provision in English law permitting penalties for an action instituted in abuse of process); the concept of "abuse of process" differs from that of "malicious prosecution" in resting upon an improper use of regularly issued process, rather than upon a wrongful issuance of process. <u>See</u>, <u>e.g.</u>, John W. Wade, <u>On Frivolous Litigation: A Study of Tort Liability and Procedural Sanctions</u>, 14 Hofstra L. Rev. 433, 451 (1986); <u>see</u> <u>also</u> <u>Rudnicki v. McCormack</u>, 210 F. Supp. 905, 910 (D.R.I. 1962) (tracing the history of bar on abuse of process from the issuance of <u>Earl of Bath v. Sherwin</u>, 4 Brown's Parl. Cas. 373 (1709), to "more recent times, [when] this power was affirmed, and perhaps extended, in England by the Vexatious Actions Act, 59 & 60 Vict. c. 51, which authorized the High Court to enjoin the

testing of the resolve or common sense of the judiciary.  Cf. Thornton v. Micrografx, 878 F. Supp. 931, 938 (N.D. Tex. 1995) ("The court refuses to leave its common sense at the courthouse steps").

If confronted by repetitive, abusive litigants, the judiciary takes measures to prevent recreational litigation.[39]  Indeed, it is well within the broad scope of the All Writs Act, 28 U.S.C. § 1651(a), for a district court to issue an order restricting meritless filing by a litigant whose manifold submissions aim to subject either his/her adversaries to unwarranted harassment or raise concern for maintaining order in the court's dockets.  See e.g., In Re Oliver, 682 F.2d 443, 445 (3d Cir. 1982) (citing Lacks v. Fahmi, 623 F.2d 254 (2d Cir. 1980) (per curiam); Harrelson v. United States, 613 F.2d 114, 115 (5th Cir. 1980) (per curiam; and Clinton v. United States, 297 F.2d 899, 901 (9th Cir. 1961), cert. denied, 369 U.S. 856, 82 S. Ct. 944, 8 L. Ed. 2d 14 (1962)).  The Court of Appeals for the Third Circuit guided that,

> [i]n appropriate circumstances, courts have gone beyond prohibitions against relitigation and enjoined persons from filing any further claims of any sort without the permission of the court.  In Rudnicki v. McCormack, 210 F. Supp. 905 (D. Mass. 1962), the court entered such an injunction after it found that, in the absence of a court-ordered proscription, a plaintiff who had "repeatedly filed groundless actions" against various state and federal officers will continue to institute groundless and purely vexatious litigation both against these defendants and against other judges and public officials, the effect of which will be to cause further harassment of these officials, further expense to the governments which they represent, and further burden upon the offices of the clerks of the courts in which such proceedings are initiated.  Id. at 911.  See also Gordon v. U.S. Department of

---

bringing of further actions by 'any person (who) has habitually and persistently instituted vexatious legal proceedings without any reasonable ground") (quotations and citation omitted).

[39] A "recreational litigant" is the "one who engages in litigation as sport and files numerous [submissions] with little regard for substantive law or court rules."  Jones v. Warden of the Stateville Correctional Ctr., 918 F. Supp. 1142, 1153 (N.D. Ill. 1995) (noting that, "[w]hen confronted with [a] recreational plaintiff, courts, to protect themselves and other litigants, have enjoined the filing . . . without leave of court" and citing In re Winslow, 17 F.3d 314 (10th Cir. 1994); In re Burnley, 988 F.2d 1 (4th Cir. 1992); and Mayfield v. Collins, 918 F.2d 560 (5th Cir. 1990)).

Justice, 558 F.2d 618 (1st Cir. 1977) (plaintiff enjoined from instituting suit against any state or federal judge, officer, or employee without permission of court); Green v. Wyrick, 428 F. Supp. 732 (W.D. Mo. 1976).

Oliver, 682 F.2d at 445.

### B.   Means of Controlling Abusive Litigation

In light of the multitude, volume and content of Telfair's submissions in this matter and in Telfair-DMC, Telfair-WJM, Telfair-DMC-Civil and Telfair-SDW, this Court must select a proper means to control Telfair's litigation practices.  In that endeavor, the Court turns for guidance to the history, goals and language of the legal provisions and case law addressing the issue.

It has become axiomatic that, when Congress enacted the Title VIII of the Omnibus Consolidated Rescissions and Appropriations Act of 1996, Pub. L. No. 104-134, 110 Stat. 1321, on April 26, 1996, the congressional purpose was, "primarily[,] to curtail claims brought by prisoners under 42 U.S.C. § 1983 and the Federal Torts Claims Act . . . many of which are routinely dismissed as legally frivolous." Santana v. United States, 98 F.3d 752, 755 (3d Cir. 1996).  In other words, the crucial part of the congressional plan was to curtail meritless prisoner suits through various restrictions.  See id.

One of these restrictions, commonly known as the "three strikes provision," prohibits prisoners with "three strikes" from taking advantage of 28 U.S.C. 1915(a)(1), the federal in forma pauperis statute, which authorizes a waiver of the fees for filing an action or appeal in federal court; a prisoner receives a "strike" each time a federal court dismisses one of the prisoner's actions or appeals as frivolous, as malicious, or for failure to state a claim.  See PLRA 804(d), 110 Stat. at 1374-75 (adding 42 U.S.C. § 1915(g)).  This provision has four key components in the sense that: (a) it only applies to prisoners; (b) it applies to civil actions and appeals; (c) it applies when the

prisoner has "three strikes"; and (d) it does not apply if the prisoner "is under imminent danger of serious physical injury."[40]  28 U.S.C. § 1915(g).   All circuit courts that have addressed the constitutionality of the provision have upheld the provision against constitutional challenges, and the United States Supreme Court invariably denied certiorari to challenges to the "three strikes provision."[41]   See, e.g., Higgins v. Carpenter, 258 F.3d 797 (8th Cir. 2001); Abdul-Akbar v. McKelvie, 239 F.3d 307 (3d Cir. 2001), cert. denied, 121 S. Ct. 2600 (2001); Rodriguez v. Cook, 169 F.3d 1176 (9th Cir. 1999); White v. Colorado, 157 F.3d 1226 (10th Cir. 1998), cert. denied,

---

[40]  The exact language of the "three strikes provision" reads as follows:

In no event shall a prisoner bring a civil action or appeal a judgment in a civil action or proceeding under this section if the prisoner has, on 3 or more prior occasions, while incarcerated or detained in any facility, brought an action or appeal in a court of the United States that was dismissed on the grounds that it is frivolous, malicious, or fails to state a claim upon which relief may be granted, unless the prisoner is under imminent danger of serious physical injury.

28 U.S.C. § 1915(g).  Notably, to qualify for the imminent danger exception, the plaintiff must detail the nature of harm and be in imminent threat of suffering serious physical injury at the time he submits his pleadings for filing.  See White v. Colorado, 157 F.3d 1226, 1232 (10th Cir. 1998) (plaintiff's use of imminent danger exception to three strikes provision is precluded because defendant failed to specify nature of harm); Medberry v. Butler, 185 F.3d 1189, 1193 (11th Cir. 1999) (plaintiff cannot use imminent danger exception to the "three strikes provision" if danger ceased prior to his submission of the complaint to his prison officials for mailing to the court).

[41]    In so ruling, the courts utilized, inter alia, the following reasoning: (a) the interests that the litigants challenging the provision sought to vindicate through filing the cases were not fundamental, see Rodriguez, 169 F.3d at 1180; White, 157 F.3d at 1233-34; Rivera, 144 F.3d at 724; Carson, 112 F.3d at 821; (b) an alternative remedy to the federal courts was available, namely the prisoner could bring a case in state court, see Abdul-Akbar, 239 F.3d at 318; Wilson, 148 F.3d at 605; see also Rivera, 144 F.3d at 724 n.9; (c) the prisoner challenging the provision lacked actual injury, see White, 157 F.3d at 1234; (d) the ability to pursue civil actions is subject to congressional limitation, since proceeding in forma pauperis in civil actions is a privilege, not a right, see Abdul-Akbar, 239 F.3d at 317; Rodriguez, 169 F.3d at 1180; White, 157 F.3d at 1233; Rivera, 144 F.3d at 723; and (e) the "imminent danger" exception guarantees that prisoners with claims implicating fundamental interests actually are able to raise such claims in federal court.  See Higgins, 258 F.3d at 800; Abdul-Akbar, 239 F.3d at 319; White, 157 F.3d at 1234.

526 U.S. 1008 (1999); Rivera v. Allin, 144 F.3d 719 (11h Cir. 1998), cert. dismissed, 524 U.S. 978

(1998); Wilson v. Yaklich, 148 F.3d 596 (6th Cir. 1998); Carson v. Johnson, 112 F.3d 818 (5h

Cir.), reh'g denied, 1997 U.S. App. LEXIS 16984 (1997).

Moreover, academic literature observed that, upon its enactment, the "three strikes

provision" was merely a codification of the already long-recognized inherent court authority to

curtail abusive litigation through imposition of carefully tailored injunctions against such filings.

See, e.g., Randal S. Jeffrey, Restricting Prisoners' Equal Access to the Federal Courts: The Three

Strikes Provision of the Prison Litigation Reform Act and Substantive Equal Protection, 49 Buffalo

L. Rev. 1099, 1141 (2001).  Indeed, a federal court's inherent power to sanction abusive litigants

by imposing filing restrictions is well established, see, e.g., Werner v. Utah, 32 F.3d 1446, 1447-48

(10th Cir. 1994) (per curiam); De Long v. Hennessey, 912 F.2d 1144, 1147-48 (9th Cir. 1990); Safir

v. United States Lines, Inc., 792 F.2d 19, 25-26 (2d Cir. 1986), cert. denied, 479 U.S. 1099 (1987);

see also Chambers v. Nasco, Inc., 501 U.S. 32, 44 (1991) (discussing the authority for, and scope

of, the inherent powers of courts); In re McDonald, 489 U.S. 180 (1989) (per curiam) (prohibiting

the petitioner from filing any additional extraordinary writs in forma pauperis), and federal courts

have long controlled overly litigious and abusive pro se litigants by injunctions limiting future

filings.[42]

_____

[42]   In 1989, basing its conclusions on this judicial practice, the Supreme Court – having
its fair share of abusive litigants – entered its first order prospectively denying pauper status to an
indigent petitioner.  See In re McDonald, 489 U.S. 180, 180 (1989).  The Court subsequently has
entered similar orders against other abusers.  See, e.g., Attwood v. Singletary, 116 S. Ct. 769,
769 (1996)  (per curiam) (ten petitions in one year); In re Sassower, 510 U.S. 4, 4 (1993) (per
curiam) (eleven petitions in three years, plus ten more during 1993); Day v. Day, 510 U.S. 1, 2
(1993) (per curiam) (twenty-seven petitions in nine years).  In 1991, the Court amended Rule
39.8 of the Rules of the Supreme Court of the United States to read as follows: "If satisfied that a
petition for a writ of certiorari, jurisdictional statement, or petition for an extraordinary writ, as

Furthermore, the court's inherent power to control abusive litigation of individuals whose litigious activities fall outside the scope of the "three strikes" provision is not limited to civil rights actions challenging incidents of prison life.  See, e.g., Butler v. DOJ, 492 F.3d 440 (D.C. Cir. 2007) (affirming the lower court's decision to utilize its supervisory discretion by denying the prisoner in forma pauperis status in a matter initiated under the Freedom of Information Act, since the prisoner had five prior appeals dismissed for failure to prosecute, had another five appeals pending, was a party to five other suits, and – in each of these actions – raised largely the same challenges while filing the same range of documents); see also Hurt v. SSA, 544 F.3d 308, 310 (D.C. Cir. 2008) (where the litigant brought numerous cases alleging various wrongs by government actors and agencies, judges and courts, and inanimate objects, the court held that "the number, content, frequency, and disposition" of a litigant's filings show an especially abusive pattern warranting denial of [in forma pauperis] status prospectively"); accord Mitchell v. Fed. Bureau of Prisons, 587 F.3d 415 (D.C. Cir. 2009) (where the litigant, technically, had only two "strikes" but employed litigation practices that abused his privilege of proceeding in forma pauperis (by making a multitude of filings that were vague and unspecific), the court found that he was subject to prospective measures limiting his ability to proceed in forma pauperis).[43]

---

the case may be, is frivolous or malicious, the Court may deny a motion for leave to proceed in forma pauperis."  In re Amendment to Rule 39, 500 U.S. 13, 14 (1991).

[43]  These decisions were rendered with regard to the matters instituted by individuals who proceeded pro se and, in addition, sought in forma pauperis status: as Telfair did in Telfair-WJM, Telfair-DMC-Civil and Telfair-SDW.  However, the power of the judiciary to limit abusive filings is not limited to such matters only: it applies to *any* matter where an abusive litigant is unable to control his/her client's litigation urges.  The Court of Appeals for the Third Circuit expressly guided that, in such cases:

> "a pattern of groundless and vexatious litigation will justify an order prohibiting further
> filings without permission of the court."  Chipps v. U.S. District Court for the Middle

**C.      Tailoring an Appropriate Preclusion Measure to Control Telfair's Filings**

**1.      Telfair's Practices Necessitate Adoption of a Control Measure**

Here, Telfair's litigious efforts in this District detected by this Court include:

(a)      *fifty-one* pro se applications, including motions, petitions and various letters, submitted by Telfair in Telfair-DMC, that is, while Telfair was represented by a chain of three defense attorneys, with the totality of Telfair's pro se submissions reaching the astonishing amount of *one thousand one hundred thirty six* pages.  See Telfair-DMC, Docket Entries Nos. 6, 8, 9, 10, 11, 13, 17, 18, 20, 21, 22, 27, 30, 33, 37, 38, 39, 40, 41, 46, 48, 49, 51, 57, 58, 59, 60, 61, 62, 71, and  United States v. Telfair, 07-0272 (the docket of Telfair's criminal proceedings preceding the docket reflect in Telfair-DMC), Docket Entries Nos. 26, 42, 48, 51, 52, 53, 54, 55, 56, 58, 59, 60, 65, 66, 67, 68, 71, 74, 75, 76 and 77;

(b)      *forty-one* pro se complaints, motions, petitions and various applications submitted in Telfair-WJM, with the totality of Telfair's submissions reaching an equally astonishing amount of  *eight hundred eighty nine* pages.  See Telfair-WJM, Docket Entries Nos. 1, 3, 4, 9, 10, 11, 12, 13, 18, 20, 25, 31, 32, 43, 37, 38, 39, 43, 44, 45, 46, 47, 48, 49, 50, 51, 52, 53, 54, 55, 56, 58, 59, 61, 62, 63, 64, 65, 66, 67 and 68;

---

District of Pa., 882 F.2d 72, 73 (3d Cir. 1989).  In addition, *a District Court has the authority to issue limitations on* pro se *filings submitted while the party is represented by counsel*.  See United States v. Vampire Nation, 451 F.3d 189, 206 n.17 (3d Cir. 2006) (citing United States v. Essig, 10 F.3d 968, 973 (3d Cir. 1993)).  Here, the District Court [repeatedly] enjoined [the represented litigant's] pro se filings, but to no avail.  To the extent that *the District Court must take additional steps to effectuate its injunction*, [*and*] *we encourage it to do so.*

United States v. D'Amario, 328 Fed. App'x 763, 764 (3d Cir. 2009) (emphasis supplied).

(c)     a thirty-six page pro se complaint in Telfair-DMC-Civil and a substantively identical forty-two page pro se complaint in Telfair-SDW, jointly yielding *seventy eight* pages; and

(d)     Form-I and Form-II, as well as the instant Motion, submitted in this matter by means of *mere four docket entries*, and yielding the total of *three hundred forty two* pages.  See Instant Matter, Docket Entries Nos. 1, 2, 5 and 6.

In other words, systemically raising and re-raising the same claims and, in addition, filing the same documents many times over, Telfair deposited on the dockets of this District the striking total of *two thousand two hundred forty five* (2,245) pages, hence transforming his litigation practices into an epitome of abusive litigation.

In light of the foregoing, this Court recognizes that Telfair's inability to control his litigious urges clogs the dockets in this District and requires judicial intervention.  Simply put, this Court , in exercise of its supervisory discretion, finds it necessary to enter a limited order of preclusion that helps Telfair to: (a) avoid repetitious filings, (b) carefully and thoughtfully select his claim; and (c) reduce these claims to clear and concise statements free from needless commentary that reduces the value of his submissions.  Cf.  Llarena v. Kinkos, 05-3410 (JBS), Docket Entry No. 2 (a standing order issued by Honorable John W. Bissell, then Chief Judge of this District, upon taking notice of abusive litigation practices displayed by a pro se plaintiff in a civil matter presided by Honorable Jerome B. Simandle; the order directed the plaintiff to show cause as to why the plaintiff should not be barred from filing *any* document without leave of court and, in addition, mandating the Clerk *not to accept any document of any kind from* the plaintiff except for the plaintiff's response to Judge Bissell's order).

**2.      The Terms of Limited Preclusion Order Entered Against Telfair**

In light of the foregoing, for the purposes of Telfair's currently pending, terminated and future actions in this District, Telfair will be directed as follows:

(1)      With regard to any Telfair's action that has not been terminated (the list of which, this Court presumes, includes <u>Telfair-DMC</u> and <u>Telfair-WJM</u>), Telfair *shall seek leave* – from the judges currently presiding over (or assigned in the future to) such action – to make any <u>pro</u> <u>se</u> submission before actually making such submission.  Each of these applications for leave to file a <u>pro</u> <u>se</u> submission shall:

   a.      Be reduced to *one-page*, *single-sided* document;

   b.      Open with a statement whereas Telfair shall *aver, under penalty of perjury and other sanctions that might be imposed by the presiding judge*, that the particular submission Telfair seeks leave to file would raise claims or allegations that:

      (i)      were *not* presented to either the presiding judge or to any other judge at any time in the past, regardless of whether these claims or allegations were already addressed by the judiciary or are still pending; and, in addition,

      (ii)      appear <u>bona</u> <u>fide</u> *in light of the guidance provided to Telfair by any judge in this District or by any other court* at any time prior to Telfair's execution of his application for leave to make a <u>pro</u> <u>se</u> submission; and

   c.      Summarize the facts that Telfair intends to assert in his <u>pro</u> <u>se</u> submission, if allowed to file it.  Such summary should be reduced to ***clear and concise language***

*not exceeding two hundred words.*[44] No generalities, supplications, lectures on law or akin will be deemed a valid summary.

In the event the Judge presiding over the matter with regard to which Telfair seeks leave to make a pro se submission grants Telfair such leave, Telfair shall make that submission *in strict compliance with the directives and requirements* set forth in that leave (as to the size, format, content, etc.).   Telfair's failure to either seek leave to file any pro se submission or Telfair's failure to comply with the requirements stated to him by the presiding Judge in the order granting leave will result in the Clerk's docketing Telfair's submission and accompanying such docket entry with a notation, reading "PURSUANT TO THE STANDING LIMITED ORDER OF PRECLUSION, THIS ENTRY IS DEEMED STRICKEN FROM THE DOCKET FOR PRO SE LITIGANT'S FAILURE TO COMPLY WITH THE REQUIREMENTS SET FORTH IN THAT ORDER OF PRECLUSION.  THE CONTENT OF THIS SUBMISSION WILL NOT BE CONSIDERED BY THE COURT."

(2)     With regard to any Telfair's action that was terminated (which include the instant action, Telfair-DMC-Civil and Telfair-SDW and all actions that become conclusively closed in the future), Telfair *shall not make any filing* except for filing of a due notice of appeal (that is, if Telfair actually desires to file an appeal with the United States Court of Appeals for the Third Circuit).   In the event Telfair makes any filing other than his notice of appeal in any matter that was or has becomes terminated, the Clerk will docket Telfair's submission, accompanying such docket entry with a notation, reading "PURSUANT TO THE

---

[44] The phrase "two hundred words" refers to all words, regardless of their length or their grammatical qualification, i.e., it includes *all* articles, prepositions, nouns, verbs, adjectives, etc.

STANDING LIMITED ORDER OF PRECLUSION, THIS ENTRY IS DEEMED STRICKEN FROM THE DOCKET FOR PRO SE LITIGANT'S FAILURE TO COMPLY WITH THE REQUIREMENTS SET FORTH IN THAT ORDER OF PRECLUSION. THE CONTENT OF THIS SUBMISSION WILL NOT BE CONSIDERED BY THE COURT."

(3)     With regard to any new matter that Telfair wishes to initiate in this District while acting pro se and proceeding in forma pauperis, Telfair *shall seek leave* from the Clerk to initiate such matter.  Such applications for leave to initiate each new pro se action in forma pauperis shall:

a.     Be reduced to *one-page*, *single-sided* document;

b.     Open with a statement whereas Telfair shall *aver, under penalty of perjury and other sanctions that might be imposed by the Court*, that the pleading Telfair seeks leave to file would raise claims or allegations that:

(i)     were *not* raised in this District or in any other court at any time in the past, regardless of whether these claims or allegations were already addressed or are still pending; and, in addition,

(ii)     appear bona fide *in light of the guidance that was provided to Telfair by any judge in this District or by any other court* at any time prior to Telfair's execution of his application for leave to file a new pleading; and

c.     Summarize the nature and facts of the allegations that Telfair intends to raise in his pro se pleading, if allowed to file it.  Such summary should be reduced to ***clear and concise language not exceeding two hundred words.***[45]     No generalities,

---

[45] See note 44, supra, this Opinion.

supplications, lectures on law or akin will be deemed a valid summary.

In the event the Clerk grants Telfair such leave, Telfair shall file a <u>bona</u> <u>fide</u> clear and concise pleading by either utilizing one of this Court's pre-printed forms (without adding any pages) or by preparing his own submission which is: (a) substantively identical, in its format, to the Court's pre-printed form; and (b) *not exceeding fifteen pages, single sided, double-spaced, utilizing a 12-point common letter font*[46] *and having margins no less than one inch on each side*.  Telfair's failure to either seek leave to file any new <u>pro</u> <u>se</u> pleading <u>in</u> <u>forma</u> <u>pauperis</u> or Telfair's failure to comply with the aforesaid format requirements will result in the Clerk's docketing of Telfair's pleading, accompanying such docket entry with a notation, reading "PURSUANT TO THE STANDING LIMITED ORDER OF PRECLUSION, THIS ENTRY IS DEEMED STRICKEN FROM THE DOCKET FOR PRO SE LITIGANT'S FAILURE TO COMPLY WITH THE REQUIREMENTS SET FORTH IN THAT ORDER OF PRECLUSION.  THE CONTENT OF THIS SUBMISSION WILL NOT BE CONSIDERED BY THE COURT" and administratively terminating the matter.

(4)     Telfair's *emergent future submissions are expressly exempt* from the requirement set forth in Paragraph (3).  This exemption, however, is limited to civil rights complaints in which Telfair asserts <u>bona</u> <u>fide</u> claims and *details facts clearly evincing that Telfair is experiencing imminent and ongoing danger to his life (or imminent, ongoing and serious danger to his*

---

[46] Noting Telfair's tendency to change fonts of his submissions, the Court stresses that Telfair's utilization of overly-narrow fonts will not be tolerated.  Thus, Telfair must either utilize common fonts, such as Arial, Courier New, Times New Roman, etc., or simply hand-print.

*health*).[47]   In the event Telfair is experiencing such danger to his life or health, he may submit his pro se pleadings and his duly executed application to proceed in forma pauperis without seeking the Clerk's leave to make such submission, provided that Telfair:

(a)     Accompanies such submission by a statement whereas Telfair shall *aver, under penalty of perjury and other sanctions that might be imposed by the Court*, that the pleading Telfair seeks to file raise claims or allegations that were *not* raised in this District or in any other court at any time in the past, regardless of whether these claims or allegations were already addressed or are still pending; and,

(b)     Reduces his pleading to a document *not exceeding fifteen pages, single sided, double-spaced, utilizing a 12-point common letter font[48] and having margins no less than one inch on each side*.

(5)     Telfair's submission of a Section 2255 motion to Judge Cavanaugh is similarly exempt from the requirement set forth in Paragraph (3).[49]   This exemption, however, is limited to a submission that Telfair would: (a) make *in good faith* and, in addition, *not prematurely;* and

---

[47]   To that extent, the Court stresses that speculative claims about potential danger (e.g., speculations about potential animus on the part of other inmates or prison officials, etc.,) would not suffice, just as assertions based on circumstances not presenting a serious danger to Telfair's health (e.g., assertions based on dietary restrictions, emotional distress, head cold, unsanitary conditions, etc.) would not suffice.  Conversely, claims asserting – for instance – facts clearly evincing *complete* denial of medical care for such conditions as already-diagnosed cancer, already-diagnosed hepatitis C, or analogously grave health threats, would qualify as emergent.

[48]   See note 46, supra, this Opinion.

[49]   Since a Section 2255 petition is effectively a motion and, as such, need not be accompanied by the litigant's in forma pauperis application, Telfair's § 2255 motion cannot, technically, qualify as a pleading within the meaning of the definition provided in Paragraph (3). However, recognizing that a litigant's filing of his/her Section 2255 motion results in initiation of a new legal action, this Court – out of abundance of caution and recognizing Telfair's need for guidance as to the proper mode of litigation practices – finds it warranted to address the issue.

(b) execute either on the Court's pre-printed Section 2255 form (without adding any pages) or reduce his challenges to a document which is not only substantively similar in its content and format to this Court's pre-printed Section 2255 form[50] but also *does not exceed fifteen pages, single sided, double-spaced, utilizing a 12-point common letter font*[51] *and having margins no less than one inch on each side*.

## VI.   CONCLUSION

For the foregoing reasons, Telfair's Motion for reconsideration will be granted in form, however, the Court's prior disposition of Telfair's claims will not change.

Petitioners' original and amended submissions filed in this matter will remain dismissed. Specifically, Telfair's habeas challenges will be dismissed as a premature Section 2255 application; his civil rights challenges will be dismissed as duplicative of those dismissed, stayed or pending in Telfair-WJM; and challenges asserting the wrongs allegedly suffered by Gatling will be dismissed for lack of standing.

No disciplinary investigation of attorney professional conduct will be initiated in this District in connection with this matter or in connection with Telfair-DMC or Gatling.  No leave to file a bona fide disciplinary grievance will be granted.

A limited order of preclusion will be entered against Telfair with regard to the instant matter and all Telfair's currently ongoing, already terminated and future actions in this District.

---

[50]  See Toolasprashad v. Grondolsky, 570 F. Supp. 2d 610, 653 (D.N.J. 2008) ("[U]nder Habeas Rule 2(e), [the petitioner] should either complete a pre-printed form or submit a similar application, since a § 2241 petition cannot be a voluminous compilation of stream-of-consciousness-like narratives").

[51]  See note 46, supra, this Opinion.

An appropriate Order accompanies this Opinion.


      s/ Garrett E. Brown, Jr.    
**Garrett E. Brown, Jr.**
**Chief Judge**
**United States District Court**


Dated:  October 15, 2010